Slip Op. 12-159

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **PEER BEARING COMPANY - CHANGSHAN,** | |
| Plaintiff, | |
| v. | **Before: Timothy C. Stanceu, Judge** |
| **UNITED STATES,** | **Consol. Court No. 11-00022** |
| Defendant, | |
| and | |
| **THE TIMKEN COMPANY**, | |
| Defendant-intervenor. | |

## OPINION AND ORDER

[Remanding the final results of an antidumping duty administrative review for redetermination]

Dated: December 21, 2012

*John M. Gurley*, *Diana Dimitriuc Quaia*, and *Matthew L. Kanna*, Arent Fox LLP, of Washington, DC, for plaintiff and defendant-intervenor Peer Bearing Company-Changshan.

*L. Misha Preheim*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With him on the brief were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director. Of counsel on the brief was *Joanna V. Theiss*, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

*Herbert C. Shelley* and *Christopher G. Falcone*, Steptoe & Johnson LLP, of Washington, DC, for defendant-intervenors Changshan Peer Bearing Co. Ltd. and Peer Bearing Company.

*William A. Fennell*, *Terence P. Stewart*, and *Stephanie R. Manaker*, Stewart and Stewart, of Washington, DC, for plaintiff and defendant-intervenor The Timken Company.

Stanceu, Judge: This consolidated case arose from the final determination ("Final Results") that the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") issued to conclude the twenty-second administrative review of an antidumping duty order (the "Order") on tapered roller bearings ("TRBs") and parts thereof, finished and unfinished, from the People's Republic of China ("China" or "PRC"). *Tapered Roller Bearings & Parts Thereof, Finished & Unfinished, From the People's Republic of China: Final Results of the 2008-2009 Antidumping Duty Admin. Review*, 76 Fed. Reg. 3,086 (Jan. 19, 2011) ("*Final Results*").  The twenty-second administrative review pertained to entries of TRBs and parts thereof from China (the "subject merchandise) that were made during the period of June 1, 2008 through May 31, 2009 (the "period of review" or "POR").  *Id.* at 3,086.

As discussed herein, the court determines that a remand is appropriate with respect to certain aspects of the Final Results that are contested in this litigation.

## I. BACKGROUND

Background is provided in a prior opinion and order and is supplemented herein.  *Peer Bearing Co.-Changshan v. United States*, 35 CIT __, __, Slip Op. 11-125, at 2 (Oct. 13, 2011) (denying a motion to dismiss one of the claims brought in this consolidated action).

Peer Bearing Company-Changshan ("CPZ"), a Chinese manufacturer of TRBs that was a respondent in the twenty-second review, brought an action to contest the Final Results. *See* Compl. (Feb. 2, 2011), ECF No. 6.  The Timken Company ("Timken"), a U.S. TRB manufacturer and a defendant-intervenor in Court No. 11-00022, also contested the Final Results.  *See* Compl. (Mar. 10, 2010), ECF No. 9 (Court No. 11-00039).  The two cases are now consolidated.  Order (June 13, 2011), ECF No. 27.

On September 11, 2008, approximately three months into the POR, various companies controlled by a Swedish conglomerate, AB SKF, acquired CPZ from its majority shareholders, the Spungen family.  *See Tapered Roller Bearings & Parts Thereof, Finished or Unfinished, From the People's Republic of China: Prelim. Results of the 2008-2009 Admin. Review of the Antidumping Duty Order*, 75 Fed. Reg. 41,148, 41,148-51 (July 15, 2010) ("*Prelim. Results*"); *Final Results*, 76 Fed. Reg. at 3,087.  At the same time, AB SKF also acquired Peer Bearing Company, an Illinois-based and Spungen-owned U.S. sales affiliate of CPZ.  *Prelim. Results*, 75 Fed. Reg. at 41,448; *Final Results*, 76 Fed. Reg. at 3,087.  During the acquisition process, CPZ and Peer Bearing Company transferred to a separate company, PBCD, their responsibilities for participation in dumping reviews and litigation and for payment of dumping duties assessed on entries of subject merchandise made prior to the acquisition.  *Letter from SKF to the Sec'y of Commerce*, at App. 2 (Mar. 19, 2010) (Admin. R. Doc. No. 5731).  In this opinion, the pre-acquisition Chinese producer is identified as "CPZ," and the pre-acquisition U.S. sales affiliate is identified as "PBCD/Peer."

After the acquisition, CPZ underwent a reorganization to become a new Chinese company, Changshan Peer Bearing Co. Ltd. (referred to herein as "CPZ/SKF" or "SKF").  *Prelim. Results*, 75 Fed. Reg. at 41,152.  CPZ/SKF and the acquired Peer Bearing Company ("SKF/Peer") are defendant-intervenors in this case.  Commerce determined that CPZ/SKF was not the successor in interest to CPZ and, therefore, treated the two companies as separate respondents in the review.  *Final Results*, 76 Fed. Reg. at 3,087.  In the Final Results, Commerce assigned weighted-average dumping margins of 38.39% to CPZ (identified in the Final Results as "PBCD") and 14.13% to SKF.  *Id*. at 3,088.

The court held oral argument on March 22, 2012.  Oral Tr. 1 (May 17, 2012),

ECF No. 90.

## II. DISCUSSION

Before the court are the motions of CPZ and Timken for judgment on the agency record,

made under USCIT Rule 56.2, to contest the Final Results.  [CPZ's] R. 56.2 Mot. for J. upon the

Agency R. (Aug. 19, 2011), ECF No. 38; [Timken's] R. 56.2 Mot. for J. on the Agency R.

(Aug. 19, 2011), ECF No. 36.

The court exercises jurisdiction according to section 201 of the Customs Courts Act of

1980 ("Customs Courts Act"), 28 U.S.C. § 1581(c) (2006).  Under this provision, the court

reviews actions commenced under section 516A of the Tariff Act of 1930 ("Tariff Act"),[1]

19 U.S.C. § 1516a(a)(2)(B)(iii), including an action contesting the Department's issuance, under

section 751 of the Tariff Act, 19 U.S.C. § 1675(a), of the final results of an administrative review

of an antidumping duty order.  In reviewing the final results, the court must hold unlawful any

finding, conclusion or determination that is not support by substantial evidence on the record or

that is otherwise not in accordance with law.  *See* 19 U.S.C. § 1516a(b)(1)(B)(i).

CPZ brings four claims in its Rule 56.2 motion.  First, it claims that Commerce

unlawfully determined that certain bearings that resulted from processing in Thailand consisting

of grinding and honing of cups and cones, and final assembly, and that were exported from

Thailand to the United States as finished products, were of Chinese origin and therefore subject

to the Order.  Pl.'s Mem. of P & A in Supp. of its Mot. for J. on the Agency R. 4 (Aug. 19,

2011), ECF No. 39 ("CPZ's Mem.").  Second, CPZ claims that Commerce calculated an

unlawful assessment rate for subject merchandise imported by Peer Bearing Company.  *Id.* at

---

[1] Further citations to the Tariff Act of 1930 are to the relevant portions of Title 19 of the
U.S. Code, 2006 edition.

2-3.  Third, CPZ claims that Commerce used an unlawful surrogate value for the steel bar input

to the TRB production process.  *Id.* at 3.  Finally, CPZ claims that Commerce used an unlawful

surrogate value for the steel wire rod input.  *Id.* at 3-4.

　　　Timken asserts two claims in its USCIT Rule 56.2 motion.  First, Timken claims that

Commerce erred in deciding not to treat SKF's acquisition of Peer Bearing Company, which

included an acquisition of inventory consisting of subject merchandise, as the first U.S. sale of

that inventory to an unaffiliated purchaser for purposes of the antidumping statute.  The Timken

Co.'s Mem. of P & A in Supp. of its Mot. for J. on the Agency R. 2, 5 (Aug. 19, 2011), ECF

No. 36 ("Timken's Mem.").  Second, Timken claims that Commerce erred in using

factor-of-production ("FOP") data pertaining to the post-acquisition producer (*i.e.*, SKF) rather

than FOP data pertaining to the pre-acquisition producer (*i.e.*, CPZ) when determining the

normal value of subject merchandise imported into the United States prior to the acquisition.

*Id.* at 2, 12-13.

　　　The court decides: (1) to direct Commerce to reconsider the Department's determination

that CPZ's bearings processed in Thailand are of Chinese origin and therefore are subject

merchandise; (2) to deny relief on CPZ's claim challenging the assessment rate; (3) to direct

Commerce to redetermine a surrogate value for CPZ's use of steel bar; (4) to deny relief on

CPZ's claim challenging the Department's surrogate value for steel wire rod; (5) to deny relief

on Timken's claim that, for antidumping purposes, a sale of the U.S. inventory occurred upon

SKF's acquisition of Peer Bearing Company; and (6) to direct Commerce to reconsider and

explain the Department's decision to use SKF's data on factors of production in determining the

normal value of subject merchandise that was imported prior to the acquisition and, therefore,

had been produced by CPZ.  The court addresses below each of these six claims.

A.  Commerce Must Reconsider its Decision that Certain Bearings on which Grinding and Honing, and Assembly Operations, Were Conducted in Thailand Are Subject Merchandise

Some of the imported bearings subject to the review were exported to the United States from Thailand after having undergone processing by a CPZ affiliate in Thailand,[2] which performed grinding and honing operations on unfinished cups and cones made in China and also performed the assembly operations, which involved the cups and cones processed in Thailand and cages and rollers produced in China.  Issues & Decision Mem., A-570-601, at 10-11 (Jan. 11, 2011) (Admin. R. Doc. No. 6041) ("*Decision Mem.*").  Commerce determined that China was the country of origin of these bearings and that, accordingly, these bearings were merchandise subject to the Order.  *Id.* 11-17; *Final Results*, 76 Fed. Reg. at 3,086.  CPZ claims that a substantial transformation occurred in Thailand resulting in finished bearings that should have been determined to have Thai origin, not Chinese origin, for antidumping purposes.  CPZ's Mem. 32-40.  CPZ argues, *inter alia*, that substantial evidence does not support the Department's origin determination and that the determination is inconsistent with rulings by U.S. Customs and Border Protection concluding on the same facts that the country of origin of the TRBs is Thailand.  *Id.* at 37-38.

In making its country of origin determination, Commerce applied what it termed its "established substantial transformation criteria," *Decision Mem.* 12, based upon the "totality of the circumstances," *id.* at 11.  In doing so, the Department discussed six criteria: (1) the class or kind of merchandise within the scope of the Order, (2) the nature and sophistication of the upstream processing (*i.e.*, the processing conducted in China) and the third-country processing (*i.e.*, the processing conducted in Thailand), *id.* at 13; (3) the identification of the processing that

_____

[2] Peer Bearing Company-Changshan ("CPZ") initially claimed confidential treatment for the identity of the third country but later, at oral argument, disclosed the identity of the country to the public.  Oral Tr. 47-48 (May 17, 2012), ECF No. 90.

imparts the essential physical or chemical properties of a TRB, *id*. at 14-15; (4) the cost of

production and value added by the third-country processing, *id*. at 15-16; (5) the level of

investment in the third country and the potential for circumvention, *id*. at 16-17; and (6) whether

"unfinished and finished bearings are both intended for the same ultimate end-use," *id*.

In summarizing its country of origin decision, Commerce stated that "the Department

recognizes that the grinding and finishing processes are important and necessary processes for

the products in question to become finished TRBs, and we do not dispute the fact that a

considerable investment was made in the third country." *Id*. at 17. The Department then stated

that "however, we do not find the investment (even though considerable) in a process (even

though important) that, as explained above, does not change the class or kind of merchandise,

does not confer the essential characteristics, does not represent a significant value added to the

final product, and does not change the ultimate end-use to be sufficient to constitute substantial

transformation." *Id*. at 17.

As discussed below, the court identifies three flaws in the Department's analysis of the

country of origin issue in this case. First, in applying its totality of the circumstances test,

Commerce gave weight to its initial criterion, the inclusion of finished and unfinished parts of

TRBs within the class or kind of merchandise defined by the scope of the Order, but it failed to

supply a reason why this criterion was relevant, on the record of this case, to the country of

origin determination Commerce was making. Second, with respect to the fourth criterion, the

Department made a finding that the processing performed in Thailand did not represent a

significant value added to the finished product, a finding that is not supported by substantial

evidence on the record. The third flaw pertains to the sixth criterion the Department identified,

the ultimate use of the bearings. Commerce found significant to its decision its finding that an

unfinished TRB is intended for the same ultimate end use as a finished TRB, but that finding has

no apparent relevance to the country of origin question posed by this case, which did not involve

third-country processing conducted on unfinished TRBs.

   1.  Commerce Failed to Provide Reasons Why Inclusion of Parts within the "Class or Kind" of
   Merchandise within the Scope of the Order Was Relevant to its Country of Origin Determination

       Commerce described the first criterion in its "totality of the circumstances" test as "Class

or Kind/Scope."  *Decision Mem.* 12.  In the Decision Memorandum, Commerce found "the

merchandise ground and finished in the third country to be of the same class or kind of

merchandise covered by the scope of the order, since the language of the scope explicitly

includes both finished and unfinished components of TRBs and no party has challenged this

'class or kind' determination."  *Id.*  Although explaining that "we did not find that this 'class or

kind' determination was dispositive in determining the TRBs' country of origin" and "instead

examined the totality of circumstances," the Decision Memorandum nevertheless clarifies that

Commerce considered integral to its country of origin determination that the Order contained

within its scope both TRBs and parts of TRBs, finished or unfinished.  *See id.*

       On the facts of this case, Commerce's determination that the processing conducted in

Thailand did not change the class or kind of merchandise would seem irrelevant to the precise

question Commerce was called on to decide.  That question was whether the Chinese-origin

parts, finished and unfinished, which were converted into completed TRBs by the processing in

Thailand, were "substantially transformed" by that processing.  In analyzing the record before it,

Commerce failed to identify any logical relationship between the Department's answer to that

question and the fact that the Order includes parts of TRBs.  Were parts of bearings not included

within the scope of the Order, any issue as to the country of origin of the TRBs that emerged

from Thailand necessarily would involve that same inquiry.  Although the parts sent to Thailand,

in the Department's view, would have been subject merchandise had they been exported from China to the United States, the fact remains that these parts instead were sent to Thailand to be subjected to further manufacturing operations from which emerged finished TRBs.

For the purpose of considering the Department's reliance on the first criterion, the court is willing to presume that the inclusion within the Order of finished and unfinished parts could have relevance for an anticircumvention inquiry by the Department. Here, however, after applying its fifth criterion (*i.e.*, level of investment in the third country and potential for circumvention), Commerce acknowledged that the Thailand operations were "important and necessary" and required "considerable investment." *Id*. at 16-17. In this way, Commerce implicitly acknowledged that its fifth criterion did not affirmatively support its ultimate origin determination (while also concluding that this criterion, standing alone, did not resolve the country of origin issue in favor of CPZ's position).[3] Nor did Commerce reach a finding that the "important and necessary" operations performed in Thailand posed any circumvention potential. The court views this omission as a flaw in the Department's analysis because Congress expressly addressed the exact circumstance posed by this case in the "prevention of circumvention" provision set forth in 19 U.S.C. § 1677j(b). Commerce chose not to invoke this provision in the Final Results. In § 1677j(b), Congress authorized Commerce, upon satisfying certain conditions, to include within the scope of an antidumping duty order merchandise imported into the United

---

[3] In its Issues & Decisions Memorandum, Commerce concluded that "[a]s in the prior review, we continue to find that PBCD has failed to provide *sufficient* record evidence to demonstrate that the level of third country investment is *sufficient*, *by itself*, to demonstrate substantial transformation has occurred." Issues & Decision Mem., A-570-601, at 10-11 (Jan. 11, 2011) (Admin. R. Doc. No. 6041) ("*Decision Mem.*") at 7 (emphasis added). This conclusion is not only circular but also clouded by the Department's acknowledgement that, as to its fifth criterion, "[t]he Department does not have an established threshold for determining whether a certain level of investment in the third country is significant in a substantial transformation analysis." *Id.* at 16 (footnote omitted).

States that is of the same class or kind as merchandise produced in the foreign country named in

the order and that, prior to such importation, is completed or assembled in a third country from

merchandise subject to the order.  19 U.S.C. § 1677j(b).  Among the conditions that must be met

before Commerce may include the completed/assembled good within the scope of an order is a

determination that the process of assembly or completion in the third country be "minor or

insignificant."  *Id.* § 1677j(b)(1)(C).  Commerce made no such determination in this case and

made certain findings (*i.e.*, that the Thai operations were important and necessary and required

considerable investment) that would appear to be inconsistent with any such determination.

Another condition imposed by the statute is a Commerce determination, absent in this case, that

"action is appropriate under this paragraph to prevent evasion of such order or finding."  *Id.*

§ 1677j(b)(1)(E).  For both determinations, the statute specifies "factors" that Commerce must

"take into account."  *Id.* § 1677j(b)(2), (3).

Having found no potential for evasion and having avoided any reliance on its

anticircumvention authority, the Department grounded its country of origin determination solely

on the narrow question of whether the TRBs processed in Thailand should be placed within the

scope of the order because they are products of China and not products of Thailand.[4]  But the fact

that the order encompasses parts, finished or unfinished, has no apparent relevance to that

question absent affirmative determinations of whether the third-country processing is minor or

insignificant and the appropriateness of the remedy, such as those Congress described in

---

[4] Prior to making the required findings under 19 U.S.C. § 1677j(b), Commerce must give
notification to the International Trade Commission of its proposed action and consider any
advice provided by the Commission in response.  19 U.S.C. § 1677j(b), (e).  Congress
provided in paragraph (e)(1) of § 1677j, however, that "[n]otwithstanding any other provision
of law, a decision by the administering authority regarding whether any merchandise is
within a category for which notice is required under this paragraph is not subject to judicial
review."  19 U.S.C. § 1677j(e)(1).

§ 1677j(b)(1)(C) and (E), respectively.  Because Commerce has not demonstrated the relevance

of its first criterion to the origin question presented, reliance on that criterion appears, on the

facts of this case, to be an attempt to avoid the strictures Congress placed in § 1677j(b).

The only rationale stated in the Decision Memorandum for the Department's basing the

country of origin determination, in part, on the inclusion of finished and unfinished parts within

the class or kind of merchandise covered by the Order is that the Department has done so in past

proceedings, including the prior review.  *Decision Mem.* 24 (citing *Tapered Roller Bearings and*

*Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of*

*the 2007-2008 Administrative Review of the Antidumping Duty Order* (Jan. 6, 2010), 75 Fed.

Reg. 844, 845; Issues & Decision Mem., A-570-601, at 6-8 (December 28, 2009)).  Mere

reliance on a practice developed over past administrative decisions is not reasoning justifying use

of a criterion that has no apparent relevance to the circumstances of this case.

## 2.  The Record Lacks Substantial Evidence to Support the Finding that the Processing Performed in Thailand Does Not Represent a Significant Value Added to the Finished Product

Applying its fourth criterion, "Cost of Production/Value Added," Commerce found as a

fact that the processing performed in Thailand added no significant value to the finished

bearings.  *Decision Mem.* 15-17.  In *Peer Bearing Company-Changshan v. United States*,

35 CIT __, __, 804 F. Supp. 2d 1337, 1342 (2011) ("*Peer Bearing I*"), this Court remanded the

final results of the previous administrative review and required Commerce to reconsider the

Department's determination of Chinese origin for TRBs that underwent processing in Thailand

that was highly similar, if not nearly identical, to the Thai processing involved in this case.  In

the previous review as well as the instant review, the processing in Thailand consisted of

grinding and honing of cups and cones, and assembly operations.  *Id.*; *Decision Mem.* 13.  In

*Peer Bearing I*, this Court concluded that the record in the previous review lacked substantial

evidence for the Department's finding that the value added in Thailand was insignificant.

35 CIT at __, 804 F. Supp. 2d at 1342.  The court reaches the same conclusion in this case.

In the instant review, Commerce, applying the same methodology as it had in the

previous review, "found that the average unit cost of manufacturing in the PRC represents a

significant percent of normal value relative to the third-country processor's costs." *Decision*

*Mem.* 15 (citation omitted).  Such a finding, however, does not logically compel the conclusion

that no significant value was added in Thailand.  The Department's framing of the issue would

imply that only a single country can impart significant value to the subject merchandise, even

though the word "significant" implies no such limitation.  Although the record might support a

finding that the value added in China exceeded the value added in Thailand, neither that finding

nor the record as a whole can support a conclusion or inference that the latter was not significant.

The Department found that "the costs involved in third country processing do not

represent a significant percent of normal value." *Id.*  In support of this finding, the Department

cited evidence submitted by Timken consisting of calculations of the percentage of

manufacturing costs and normal value attributable to Thai processing for various of CPZ's

bearing models.  Citing this evidence, the Department concluded that "third-country processing

costs do not represent a significant amount, let alone the majority, of either the reported

manufacturing costs or calculated normal value costs when compared to the costs incurred for

the processing performed on the merchandise in the PRC." *Id*. at 15-16 (citing *Rebuttal Br. of*

*the Timken Co., Petitioner[,] Regarding PBCD*, at 47-48 (Oct. 12, 2010) (Admin. R. Doc.

No. 5934) ("*Timken's Rebuttal*")).  In the Decision Memorandum, Commerce did not explain

how Timken's calculations were derived.  But even were the court to presume, *arguendo*, that

the results of Timken's calculations are valid, the court still could not agree with the

Department's generalized characterization that the costs incurred in Thailand were an insignificant percentage of normal value.[5]

The record in this review contains qualitative evidence submitted by CPZ that is relevant to the question of value added in Thailand.  *See Sections C and D Joint Resp. of SKF and CPZ*, Ex. E-1 (May 28, 2010) (Admin. R. Doc. No. 5760).  CPZ's submission includes a "work process" chart for the grinding center in Thailand and a "working chart" for the Thailand assembly shop.  *Id*. Ex. E-1, at 4-5.  The work process chart describes multiple machining processes performed on cones, specifically, raceway grinding, followed sequentially by rib grinding, inner-diameter grinding, and super-finishing of ribs and raceways, and it also describes grinding and super-finishing processes performed on cups.  *Id*. Ex. E-1, at 4.  Commerce appears to have given little if any probative weight to this qualitative evidence, which detracts from the Department's country of origin determination.[6]

In summary, Department's finding, made under the "Cost of Production/Value Added" criterion, that no significant value had been added to the finished TRBs as a result of the processing conducted in Thailand is not supported by substantial evidence on the record.

---

[5] The Department's comparing processing costs to normal value raises a tangential question in that aspects of normal value are at issue in this case.

[6] Commerce rejected an argument made by CPZ that pointed to a recent Commerce country of origin decision (which also applied a "totality of the circumstances" test) concluding that the "numerous steps and specialized equipment needed to laminate the exterior ply of plastic film on [woven sacks]" constituted "significant additional processing" sufficient to confer county of origin.  *Decision Mem*. 15-16 (citing *Laminated Woven Sacks From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review*, 75 Fed. Reg. 55,568 (Sept. 13, 2010)).  It appears from the Decision Memorandum that Commerce summarily disregarded the qualitative evidence that the Thai processing added value by setting up a value-added threshold.  Commerce stated that "PBCD has provided no evidence to support its assertion that the value added in the instant case is more substantial than the value added to the merchandise at issue in [Laminated Woven Sacks]."  *Decision Mem*. 16.

3.  Commerce Has Not Shown the Relevance of its Finding that an Unfinished TRB Is Intended
for the Same Ultimate End Use as a Finished TRB

Applying the sixth criterion in its "totality of the circumstances" test, "ultimate use,"

Commerce made a finding that an unfinished TRB is intended for the same ultimate end use as a

finished TRB.  *Decision Mem.* 17.  Specifically, the Decision Memorandum restates a finding

Commerce made in the prior review: "In the prior review, we determined that, while the

unfinished TRB is not suitable for use in a downstream product, both unfinished and finished

bearings are both [*sic*] intended for the same ultimate end-use (*i.e.*, as a TRB which can

ultimately be used in a downstream product.)"  *Id.* (footnote omitted).  The Decision

Memorandum adds that "[n]o party has commented on or challenged this determination

regarding 'ultimate use' in the instant proceeding" and that "[a]s such, we continue to find that

the merchandise in question is intended for the same ultimate end-use as a finished bearing."  *Id.*

It is understandable that no party challenged the finding, which is unassailably correct.  An

unfinished bearing obviously has no use except to become a finished bearing, and in that sense

finished and unfinished TRBs have the same "ultimate" end use.  But the finding the Department

reached is also irrelevant, as the country of origin question presented in this case did not involve

an unfinished TRB.  The grinding and finishing operations occurring in Thailand were performed

on unfinished rings (cups and cones) that were produced in China, and the assembly operations

in Thailand were performed on the products of those operations and on cages and rollers that

were produced in China.  No individual part exported from China to Thailand plausibly could

have been found to be an unfinished bearing, and Commerce made no finding to that effect.  The

question presented is whether those individual parts (finished and unfinished) were substantially

transformed by the third country processing, which included grinding, finishing, and assembly,

not whether unfinished bearings were substantially transformed by that processing.  The

Department's application of the sixth criterion, therefore, has no apparent relevance to the country of origin issue presented by this case.

4.  On Remand, Commerce Must Reconsider its Country of Origin Determination in the Entirety

As revealed by the discussion in the Decision Memorandum, which describes a "totality of the circumstances" test, Commerce did not intend for the analysis it performed under any of its three remaining criteria to be sufficient to support its entire country of origin determination. As Commerce implicitly acknowledged, and as the court previously discussed, the analysis Commerce conducted under the fifth criterion, level of investment/potential for circumvention, did not lend support to the final determination.  As to the second criterion, which Commerce termed "Nature/Sophistication of Processing," Commerce reiterated its finding from the previous review that "the finishing process [*i.e.*, grinding and honing of cups and cones] . . . is an important and necessary part to becoming a finished TRB because it reduces friction and enables the TRB to carry a load," *Decision Mem.* 13, but again concluded, nevertheless, that "the finishing process in and of itself is not significant enough to be considered a process that substantially transforms the subject merchandise for antidumping purposes, because there is no substantial change to the primary properties of the subject merchandise other than slight alterations to the shape of the TRB through the finish grinding processes and a smoothing of the TRB's cup and cone raceways through the honing process," *id.* (citation omitted).  This conclusion, limited in scope, does not address the overall question to be decided.  That question, as the court repeatedly has emphasized, is whether the parts made in China, which included the unfinished cups and cones and the cages and rollers, were substantially transformed by the entirety of the processing performed in Thailand.  It is not a question of whether the grinding and honing of cups and cones was enough, standing alone, to constitute a substantial transformation.

Any valid resolution of the origin question posed by this case must consider the assembly

process and the fact that the two major components of TRBs, the cups and cones, underwent not

only assembly in Thailand but *also* grinding and finishing, which Commerce found to be

important and necessary to the functioning of a TRB.

Under its third criterion, "Physical/Chemical Properties and Essential Component,"

Commerce concluded, as it had in the previous review, that forging, turning, and heat treatment

of cups and cones, "along with roller and cage operations," . . . "imparted the essential physical

and chemical properties of the TRB." *Id*. at 14.  Here also, the Decision Memorandum does not

state or imply that this conclusion, standing alone, should be seen as sufficient to support the

Department's entire, ultimate determination of country of origin.  This conclusion was made

independently of other evidence on the record.  For example, it is uncontested that the cups and

cones left China in an unfinished state.  Although they had been forged, turned, and heat treated,

the cups and cones as exported were not yet capable of performing the functions of cups and

cones because they had not been ground and finished to the required dimensions.  As Commerce

itself impliedly recognized, cups and cones must be machined to a smooth finish and within

close tolerances in order to permit assembly into a finished article that will carry the load and

reduce friction.  Moreover, the Department's reference to "roller and cage operations" also must

be read in the context of the record as a whole, which contained uncontested evidence that the

roller and cage operations, like the machining operations done on the cups and cones, occurred

partly in China and partly in Thailand: all assembly operations involving rollers and cages (as

well as those involving cups and cones) were conducted in Thailand, not China.  With respect to

any "essential component," Commerce did not find, and lacked evidence from which to find, that

any single component imparted the essential character to the finished TRB.

In summary, the court concludes that the Department's determination that the finished bearings resulting from the operations in Thailand were of Chinese origin is flawed because Commerce failed to show the relevance, on the record of this case, of the first and sixth criteria it applied and because the Department's finding, made upon applying the fourth criterion, that the Thai processing "does not represent a significant value added to the final product," *id*. at 17, is not supported by substantial evidence on the record viewed as a whole.  Because of the various flaws the court has identified in the Department's "substantial transformation" analysis, Commerce must reconsider the Department's country of origin determination in the entirety. Any determination Commerce reaches on remand must rely solely on criteria relevant to whether the parts exported to Thailand were substantially transformed and must be based on findings supported by substantial record evidence.  Moreover, the decision must be supported by an adequate explanation of the Department's reasoning.

### B.  No Relief is Available on the Challenge to the Assessment Rate for PBCD/Peer

Commerce calculated separate assessment rates for the POR entries of subject merchandise made by the pre-acquisition Peer Bearing Company, *i.e.*, PBCD/Peer, and those made by the post-acquisition Peer Bearing Company, *i.e.*, SKF/Peer.  *Decision Mem.* 21 & n.52. Commerce calculated PBCD/Peer's assessment rate by dividing the sum of the individual dumping margins that Commerce determined for each examined sale made prior to the acquisition by the sum of the entered values of the merchandise on those same sales.  *Id.* at 21. The examined sales that occurred prior to the acquisition were "PBCD/Peer's downstream sales of merchandise during the POR."  *Id.*  Commerce instructed Customs to apply the resulting percentage to the entered value of subject merchandise on each of the POR entries made by

PBCD/Peer, all of which occurred up until the acquisition.  *Id.* at 21 n.52.[7]  Commerce

determined an assessment rate for SKF/Peer by performing the same type of calculation, using

the examined post-acquisition sales, all of which were "SKF/Peer's downstream sales of

merchandise during the POR," and the entries made by SKF/Peer, all of which occurred after the

acquisition.  *Id.* at 21.

        CPZ objects to the Department's method.  Referring to subject merchandise that was

entered by PBCD/Peer prior to the acquisition and sold by SKF/Peer from inventory after the

acquisition, CPZ argues that "Commerce should have calculated a weighted-average assessment

rate for PBCD/Peer based on the assessment rate calculated for this importer both in the RPOR

[the "reduced POR," *i.e.*, the portion of the POR ending September 11, 2008] and the portion of

the POR after September 11, 2008."  CPZ's Mem. 15.  For the reasons discussed below, the

court rejects the claim that Commerce acted unlawfully in determining PBCD/Peer's assessment

rate.

        The antidumping statute provides that Commerce will determine the normal value, export

price or constructed export price, and the dumping margin, for each entry of subject

merchandise, 19 U.S.C. § 1675(a)(2)(A)(ii), and that this determination "shall be the basis for the

assessment of . . . antidumping duties," *id.* § 1675(a)(2)(C).  Rather than ground its arguments in

that provision, CPZ points to the Department's regulations, which provide that Commerce

"normally will calculate an assessment rate for each importer of subject merchandise covered by

_____

        [7] Commerce indicated that it would instruct Customs to assess PBCD antidumping duty
liability on subject merchandise "imported, and withdrawn from warehouse for consumption
during the period 06/01/2008 through 09/12/2008" and to assess SKF antidumping duty
liability on subject merchandise "imported, and withdrawn from warehouse for consumption
during the period 09/12/2008 through 05/31/2009."  *Decision Mem.* 21 n.52.  It appears from
the context that the first reference to 09/12/2008 was intended to be a reference to the date of
acquisition, 09/11/2008.

the review" and that Commerce "normally will calculate the assessment rate by dividing the

dumping margin found on the subject merchandise examined by the entered value of such

merchandise for normal customs duty purposes."  19 C.F.R. § 351.212(b)(1) (2008).

CPZ argues, first, that the method Commerce used to calculate the assessment rate for

PBCD/Peer is inconsistent with § 351.212(b)(1), in two respects.  First, CPZ characterizes the

assessment rate assigned to PBCD/Peer as "seller-specific" rather than "importer-specific,"

arguing that an "importer-specific" assessment rate is contemplated by the regulation.  CPZ's

Mem. 14.  Second, pointing out that "all of the POR sales by SKF/Peer from pre-existing

inventory are based on entries by PBCD/Peer," *id*. at 10-11 (footnote omitted), CPZ submits that

"the assessment rate for SKF/Peer incorrectly includes entries made by both SKF/Peer and

PBCD/Peer, while the assessment rate for PBCD/Peer does not take into account post-acquisition

sales corresponding to entries by PBCD/Peer," *id*. at 14.  CPZ argues that the language of the

regulation "is unequivocal that the importer-specific assessment rate is limited to that importer's

entries" and that ". . . the assessment rate calculated for SKF/Peer in the Final Result[s] is

inconsistent with that language on its face."  *Id*. at 13.

The court does not agree that the assessment rate Commerce calculated for PBCD/Peer is

not "importer specific."  Commerce determined a separate assessment rate for each of the two

importers, PBCD/Peer and SKF/Peer, thus adhering to its normal practice as reflected in the first

sentence of § 351.212(b)(1), under which Commerce "normally will calculate an assessment rate

for each importer of subject merchandise covered by the review."  Because each assessment rate

was individual to the respective importer, the Department's method was not inconsistent with the

procedure specified in the first sentence.

According to the second sentence of § 351.212(b)(1), Commerce "normally will calculate the assessment rate by dividing the dumping margin found on the subject merchandise examined by the entered value of such merchandise for normal customs duty purposes."  For two reasons, the court disagrees with CPZ's argument as it relates to the second sentence of the regulation.  First, the regulation sets forth a "normal" method from which Commerce has discretion to make exceptions.  Second, even if the regulation were binding as written, the court would not agree with plaintiff's construction of the regulation, under which an assessment rate specific to an importer must be calculated using margins, and entered value, determined solely according to entries made by that importer.  CPZ's Mem. 13.  The court addresses each of these two points below.

In the review, Commerce found that CPZ/SKF was not the successor in interest to CPZ and that SKF/Peer was not the successor in interest to PBCD/Peer.  *Final Results*, 76 Fed. Reg. at 3,087.  On the basis of these two findings, neither of which CPZ contests, Commerce split the POR into two segments based on the September 11, 2008 date of the acquisition, after which date Commerce considered PBCD/Peer to no longer exist and considered SKF/Peer to have made both the sales and the entries.  Because the constructed export price method of determining U.S. price was used in this review, the sales examined appear to have occurred, in many if not all cases, after the entry was made, resulting in what CPZ describes as "post-acquisition sales" by SKF/Peer "corresponding to entries by PBCD/Peer."  CPZ's Mem. 14.  Commerce calculated "importer-specific" assessment rates for PBCD/Peer and for SKF/Peer based on the respective sales made by each—and directed Customs to apply those separate assessment rates to the respective entries made by each—during the separate portions of the POR.  *Decision Mem.* 21 & n.52.

The second sentence of § 351.212(b)(1) uses the word "normally" in describing the method of calculating an assessment rate and thereby allows the reasonable exercise of discretion in making such determination.  Accordingly, the court need not decide whether Commerce calculated PBCD/Peer's assessment rate according to the precise method set forth in the second sentence of § 351.212(b)(1).  Here, Commerce calculated two separate aggregate dumping margins, one based on the sales by PBCD/Peer and the other based on the sales by SKF/Peer, and then divided each by the entered value of the respective merchandise on the two groups of sales.  Thus, the method Commerce used essentially applied the calculation specified in the "normal" method not once, but twice.  This might be described as a variation from the normal method of the second sentence in that the period of review was split into two separate sub-periods for purposes of determining individual assessment rates for PBCD/Peer and for SKF/Peer.  Because Commerce usually has occasion to recognize only one period of review in an administrative review proceeding, § 351.212(b)(1) ordinarily is applied according to the single, undivided POR corresponding to the period of the review Commerce is conducting.

Plaintiff errs in construing § 351.212(b)(1) to contemplate that an assessment rate specific to an importer will be calculated using the aggregate of the margins, and of the entered values, determined solely according to entries made by that importer.  The language of the regulation, when read according to plain meaning, does not impose such a requirement.  Under the normal method the regulation sets forth, an importer-specific assessment rate is *applied* to all of an importer's entries that occurred during a period of review, but it is not necessarily *calculated* solely according to entries made during that period of review, nor must it be calculated exclusively according to entries made by that importer.  The normal method, which involves an examination of sales occurring during a period of review, does not rely on an exact

correspondence between such sales and the entries that occurred during that same period of

review.  *See Peer Bearing I*, 35 CIT at __, 804 F. Supp. 2d at 1343-44.  In summary, the court

has no basis to conclude that in determining PBCD/Peer's assessment rate, Commerce acted

inconsistently with its regulation.

   CPZ also alludes to an inconsistency with the Department's "practice," citing various of

the Department's past administrative determinations for the proposition that it "is not aware of a

similar case where Commerce has exercised its discretion to calculate importer-specific

assessment rates in a manner so plainly inconsistent with its regulations."  CPZ's Mem. 14

(citations omitted).  Specifically, CPZ argues that Commerce, rather than calculate what plaintiff

characterizes as "seller-specific" assessment rates, should have followed the method CPZ

suggested, *i.e.*, calculation of a weighted-average assessment rate for PBCD/Peer based on both

portions of the POR, because that method would have been consistent with the approach

Commerce took in a past review, *Notice of Final Results of Antidumping Duty Administrative

Review: Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 73,437 (Dec. 12, 2005).

*Id.* at 14-15.  CPZ characterizes the review at issue in this case as similar to the *Softwood Lumber

Products* review, "where, as a result of multiple acquisitions of producers (and exporters) of

subject merchandise, Commerce calculated multiple cash deposit rates and assessment rates for

various portions of the POR."  *Id.* at 14 (footnote omitted).  CPZ argues that Commerce's

rationale for not following the *Softwood Lumber* approach in this review "is inconsistent with

Commerce's claim that it has calculated importer-specific assessment rates," *id.* at 16, and that

"Commerce has failed to explain how this methodology is consistent with 19 C.F.R.

§ 351.212(b)(1)," *id.* at 16-17.

The court does not find merit in the argument that Commerce impermissibly departed from a practice.  Commerce distinguished its past administrative determinations by explaining in the Decision Memorandum that because PBCD/Peer and SKF/Peer were separate entities, and the latter was not a successor in interest to the former, it was appropriate to calculate period-specific assessment rates for PBCD/Peer and for SKF/Peer based on the respective sales by each made in the portion of the period of review in which each existed.  *Decision Mem.* 19. The court concludes that Commerce had adequate reasons to distinguish this case from the past determinations.[8]  For reasons the court already has discussed, CPZ is incorrect in claiming that the assessment rates were not importer-specific and fails to make any convincing case as to the Department's regulation, which allows a measure of discretion.

Commerce provided reasons for exercising its discretion in the way that it did.  In the Decision Memorandum, Commerce identified an objective "to prevent one importer from becoming liable for another importer's [antidumping] duties," and it considered its method of determining the assessment rates "particularly appropriate in consideration of the Department's

---

[8] In *Certain Softwood Lumber Products from Canada*, Commerce confronted the issue of how to calculate assessment rates when two respondents were amalgamated in the last month of the POR, with the resulting company being successor in interest to both.  *Notice of Final Results of Antidumping Duty Admin. Review: Certain Softwood Lumber Products From Canada*, 70 Fed. Reg. 73,437 (Dec. 12, 2005) and Issues & Decision Mem., A-122-838, ARP 4-04, at 73 (Dec. 12, 2005).  In *Small Diameter Carbon Pipe from Romania*, the issue was how to calculate assessment rates when there was only one importer but both market and non-market economy portions of the POR.  *Certain Small Diameter Carbon & Alloy Seamless Standard, Line, & Pressure Pipe From Romania: Final Results of Antidumping Duty Admin. Review & Final Determination Not To Revoke Order in Part*, 70 Fed. Reg. 7,237 (Feb. 11, 2005) and Issues & Decision Mem., A-485-805, ARP 7-03 (Feb. 4, 2005); *see also Certain Cut-to-Length Carbon Steel Plate from Romania: Notice of Final Results & Final Partial Rescission of Antidumping Duty Admin. Review*, 70 Fed. Reg. 12,651, 12,653 (Mar. 15, 2005) (same).  In *Fresh Atlantic Salmon from Chile*, Commerce set cash deposit rates in the preliminary results for two respondents that were collapsed during the POR.  *Notice of Prelim. Results of Antidumping Duty Admin. Review, Prelim. Determination To Revoke the Order in Part, & Partial Rescission of Antidumping Duty Admin. Review: Fresh Atlantic Salmon From Chile*, 67 Fed. Reg. 51,182, 51,191 (Aug. 7, 2002).

longstanding practice to calculate assessment rates based on the entered value corresponding to

the sales examined for each importer during the POR, and not the entered value of all products

actually entered during the POR." *Id.* at 21 (footnote omitted).  CPZ argues that these two stated

reasons, as offered in support of the Department's determination, "are either incorrect or fail to

consider the unique facts of this case."  CPZ's Mem. 17.

Specifically, CPZ points to the statement by the Department in the Decision

Memorandum that "we agree with SKF that because it was the downstream sales by SKF/Peer

which gave rise to the [antidumping] duties on the products in question and, because SKF/Peer

had some control over the terms of these sales, it is not improper for SKF/Peer to be liable for the

resulting duties." *Decision Mem.* 21.  CPZ argues, in turn, that the Department's logic "is flawed

because it focuses only [on] the numerator . . . of the assessment rate calculation."  CPZ's

Mem. 19.  According to CPZ, "the denominator of the assessment rate formula (entered value)

was determined by PBCD/Peer alone," who, CPZ alleges, was "just as involved in the resulting

antidumping duties and assessments for these entries as is SKF/Peer who made the U.S. sales."

*Id.*  CPZ submits that "Commerce's insistence on the fact that its assessment rate methodology

ensures that neither importer bears liability for the other['s] antidumping duties is not confirmed

by the facts."  *Id.*  CPZ argues that the Department's focus on SKF/Peer's having some control

over the terms of the sale "ignored the fact that importers are deemed to be responsible for duties

related to the sales, whether they have 'control' or not," *id.*, and that, accordingly, "the issue of

'control' over sales has little to do with whether importers are liable for entries made by them,"

*id.* at 20.  From all of these assertions, CPZ repeats its contention that "Commerce's assessment

methodology is contrary to its regulations and practice and is not supported by substantial

evidence on the record."  *Id.*

The court explained previously why the calculation method cannot be said to be contrary to the regulation or to the Department's practice.  A valid claim that a determination is not supported by substantial evidence must be grounded in a disputed finding of fact, and plaintiff, while theorizing as to the significance of the denominator of the Department's formula and taking issue with the associated explanation, fails to identify a discrete finding of fact that it wishes to contest.

The remainder of CPZ's lengthy argument is, in essence, a contention that the method Commerce chose made PBCD/Peer liable for antidumping duties that should have been assessed to SKF/Peer.  The court finds this contention unpersuasive.  For each of the two separate assessment rate calculations, the denominator of the Department's formula was the aggregate entered value of the merchandise on the examined sales of the particular importer; Commerce used these same sales to determine the aggregate margin comprising the numerator of the formula.  Thus, the aggregate margin used to determine PBCD/Peer's assessment rate was determined according to PBCD/Peer's own sales during the POR; Commerce followed the parallel procedure in determining the assessment rate for SKF/Peer.  The normal method set forth in 19 C.F.R. § 351.212(b)(1) relies on the examined sales made during the POR, not the entries made during the POR, to calculate an assessment rate to be applied to all of an importer's POR entries.  It does not entail the Department's calculating an individual margin for each entry that an importer made during the POR based on the actual sale associated with that entry.  The fact most emphasized by CPZ—that POR sales by SKF/Peer involved merchandise previously imported by PBCD/Peer—does not itself establish that PBCD/Peer improperly was assessed SKF/Peer's antidumping duties.  CPZ also emphasizes that PBCD/Peer "determined" the entered value for each of its POR entries by making those entries, but CPZ's emphasizing this point does

not refute the fact that Commerce based the assessment rate for PBCD/Peer, and the one for

SKF/Peer, on the POR sales that each importer actually made.

   C.  A Remand is Required on CPZ's Claim Challenging the Surrogate Value of Steel Bar

   In determining the normal value of subject merchandise from a nonmarket economy

country such as China, Commerce, under section 773(c)(1) of the Tariff Act, ordinarily values

"the factors of production utilized in producing the merchandise."  19 U.S.C. § 1677b(c)(1).  The

statute requires generally that Commerce value factors of production "based on the best available

information regarding the values of such factors in a market economy country or countries" that

Commerce considers appropriate.  *Id.*  CPZ claims that Commerce failed to use the best available

information on the record to value bearing-quality steel bar, which was one of the materials CPZ

used to produce subject merchandise prior to the acquisition.  CPZ's Mem. 20-32.  The court

concludes that a remand is required on this claim.

   Commerce valued CPZ's bearing-quality steel bar inputs by using publicly-available

information on the average unit value ("AUV") of Indian imports made during the POR, as

reported by Global Trade Atlas ("GTA").  *Decision Mem.* 31; *Prelim. Results*, 75 Fed. Reg. at

41,150, 41,155.  From the GTA import data pertaining to Indian Harmonized Tariff Schedule

("HTS") subheading 7228.30.29,[9] Commerce calculated an AUV of $1,956 per metric ton

("MT").[10]  *Mem. to the File from Int'l Trade Compliance Analyst*, at 4 n.7 (Jan. 11, 2011)

---

   [9] Commerce describes this tariff subheading as applicable to "Other bars and rods of other
alloy steel; angles, shapes and sections, of other alloy steel; hollow drill bars and rods, of alloy or
non-alloy steel; Other bars and rods, not further worked than hot-rolled, hot-drawn or extruded;
Bright Bars; Other."  *Decision Mem.* 29 n.86.

   [10] The actual surrogate value was slightly below this amount because Commerce combined
the public import data with proprietary data pertaining to certain market economy purchases of
steel bar by CPZ.  *Mem. to the File from Int'l Trade Compliance Analyst*, at Attach. 1 (Jan. 11,
2011) (Admin. R. Doc. No. 6039).

(Admin. R. Doc. No. 6039) ("*Final Analysis Mem. - PBCD*").  Observing that this subheading is not specific to bearing-quality steel goods, Commerce used only the GTA import data thereunder that pertained to Indian imports from the United States, Japan, and Singapore, determining from record evidence that the other countries of origin shown in the GTA data (Austria, Canada, France, Germany, Slovenia, Turkey, and Taiwan) "could not be shown definitively to have exported bearing quality steel to India during the POR."  *Decision Mem.* 34 (footnote omitted). That record evidence consisted of Indian import data compiled by Infodrive India ("Infodrive"), which CPZ placed on the administrative record during the review.[11]  *Id.* at 33-34.

Although relying on the Infodrive data for its finding that, among the imports under Indian HTS subheading 7228.30.29, bearing-quality steel was included only among the imports from the United States, Japan, and Singapore, Commerce did not base its surrogate value on Infodrive data pertaining to bearing-quality steel imports.  *Id.*  Arguing that "[i]f Commerce were to use a surrogate value price derived solely from bearing-quality steel from the Infodrive data, the resulting surrogate value is only $1,596/MT," CPZ claims that the determination to use the surrogate value of $1,956 per metric ton derived from the GTA import data is "distortive as it reflects high-priced imports of non-bearing quality steel from the U.S., Japan, and Singapore," and, therefore, "cannot be supported by substantial record evidence."  CPZ's Mem. 28-30 & Attach. 2.

CPZ placed on the administrative record an analysis of the GTA and Infodrive data sets that, according to CPZ, "demonstrated that Indian HTS 7228.30.29 contained large amounts of high-priced steel that was clearly not bearing quality steel."  *Id*. 22-23 (citing *Letter from PBCD*

---

[11] Infodrive India ("Infodrive") is a private entity located in India that provides data on imports and exports.  *See Peer Bearing Company-Changshan v. United States*, 35 CIT __, __, 804 F. Supp. 2d 1337, 1348 n.13 (2011) (citation omitted).

*to Sec'y of Commerce*, at Ex. 1 (Aug. 19, 2010) (Admin. R. Doc. No. 5887); *Letter from PBCD*

*to the Sec'y of Commerce*, at Ex. 3 (Oct. 4, 2010) (Admin. R. Doc. No. 5917) ("*CPZ's Case*

*Br.*")).  Commerce made no finding to the contrary and acknowledged "that Infodrive shows that

the Indian dataset contains entries *not specific to the input in question . . .*"  *Decision Mem.* 34

(emphasis added).  Commerce responded to this acknowledged shortcoming in the GTA import

data by "using the quantity and value data of Indian imports from the United States, Japan, and

Singapore in Indian HTS subheading 7228.30.90 obtained from GTA, for these final results."  *Id.*

(footnote omitted).  The Final Results, however, fail to correct the problem CPZ identifies, *i.e.*,

the presence of substantial quantities of non-bearing-quality steel goods within the dataset

Commerce chose.  The Decision Memorandum itself refers to non-bearing-quality steel import

entries included within the GTA import data as "entries not specific to the input in question."  *Id.*

However, the Department's surrogate value of $1,956 per metric ton cannot be shown to have

been based entirely, or even principally, on Indian import data that *were* specific to the input

being valued.  The record evidence, therefore, is insufficient to support a finding that the subset

of GTA Indian import data Commerce used to derive the $1,956 value were the best available

information on the record for use in valuing the factor of production.

        Defendant raises several arguments in support of the Department's surrogate value.

Defendant argues, first, that "Commerce's use of Infodrive India data to evaluate the import data

and exclude countries that did not export bearing quality steel to India rendered the Indian data

the most specific on the record, and yielded a surrogate value that reasonably reflects the cost of

bearing quality steel bar for the POR."  Def.'s Opp'n to Pls.' Mots. for J. upon the Agency R. 28

(Oct. 28, 2011), ECF No. 53 ("Def.'s Mem.").  This argument mischaracterizes the record

evidence.  The GTA data the Department used were not the record data most specific to the input

being valued, as those data contained substantial quantities of non-bearing-quality steel.  The

Infodrive AUV data, on the other hand, are specific to goods made of bearing-quality steel.

Second, defendant argues that "[a]lthough PBCD/Peer contends that Commerce should

have excluded all entries that were not listed as 'bearing quality steel' according to Infodrive

India, Commerce's determination to include exports from the countries that exported bearing

quality steel to India during the POR was consistent with its practice of using broad market

averages that are representative of a significant quantity of imports."  *Id*. at 28-29.  Referring to

the Department's established criteria, defendant makes the related argument that Commerce

found that the GTA data under Indian HTS subheading 7228.30.90 "are publicly available, broad

market averages, contemporaneous with the POR, tax exclusive, and representative of significant

quantities of imports."  *Id*. at 30 (citing *Final Results*, 76 Fed. Reg. at 3,088 and *Decision*

*Mem.* 31) (internal quotation marks omitted).  There are two flaws in these arguments.  First,

Commerce did not state expressly in the Decision Memorandum that it considered the Infodrive

data on bearing-quality steel imports to constitute an unrepresentative quantity.  *Decision*

*Mem*. 31-34.  Second, the argument is illogical.  As the court noted above, the Decision

Memorandum itself characterizes non-bearing-quality steel imports as "entries not specific to the

input in question."  *Id*. at 34.  If, as defendant's argument would hold, the Infodrive data on

bearing-quality steel represent too small a quantity to support a surrogate value, and if, as

Commerce itself stated, non-bearing-quality steel is not specific to the input being valued, then

diluting the specific data by combining those data with non-specific data cannot improve, and

can only compromise, the result.  Commerce made its exclusions from the GTA database on a

country-by-country basis, but it did so according to the Infodrive database, which allowed

specific identification of quantities and values for bearing-quality steel.  If an entry of a steel

good from the United States, Japan, or Singapore was of non-bearing quality steel, the steel

goods on that entry do not magically become specific to the input being valued simply by

originating in a country that also exported goods that were of bearing-quality steel.  For this

reason, the Department's "country-wide" methodology did not cure the problem posed by the

overbreadth of Indian HTS subheading 7228.30.90.  *See Zhejiang Dunan Hetian Metal Co. v.*

*United States*, 652 F.3d 1333, 1343 (Fed. Cir. 2011) (opining in *dicta* that "calculating a

surrogate value on the basis of every material imported under the HTS heading, in the face of

InfoDrive descriptions suggesting that certain imports were not representative, might well

conflict with Commerce's obligation to use the best available evidence for its calculation of

surrogate value.").

         Nor did Commerce find the Infodrive data to be unreliable.  To the contrary, Commerce

expressly found that the Infodrive data were credible evidence of the quantity and value of

imports into India during the POR, stating that "we find that the Infodrive data . . . demonstrates

significant coverage of the GTA data, and can be used as a probative tool to corroborate the

surrogate value in question," *Decision Mem.* 31 (stating that "over 93 percent of both the total

GTA quantity and value from all countries that the Department includes in its SV calculations is

accounted for in the total quantifiable[12] weight and value figures from the corresponding

Infodrive data" (footnote omitted)); and that "there is remarkable correlation between the values

reported in each dataset (*i.e.*, nearly 100 percent for most countries)," *id.* at 33 n.102.  Commerce

also determined that the Infodrive data were a credible basis for discerning which entries were

bearing-quality steel bar, stating that "no interested party to this proceeding has objected to

---

[12] The Global Trade Atlas data refer only to entries denominated in quantifiable terms such
as kilograms, as opposed to "sets" or "pieces."  *Decision Mem.* 33 n.102.  The Infodrive analysis
thus excludes Infodrive data that is not quantifiable.

PBCD's overall separation of the Infodrive line items as 'included as bearing quality steel' or not, nor has any interested party questioned the term 'bearing-quality' as it exists in the Infodrive data." *Id.* at 34.

In summary, substantial evidence does not support a finding that the subset of GTA data chosen by Commerce was the best available information for use in valuing the bearing-quality steel bar that CPZ used to produce its subject merchandise.  On remand, Commerce must reconsider this finding, consider what alternatives are feasible based on the record before it, including in particular the use of the Infodrive data to determine a surrogate value, and reach a surrogate value shown by substantial evidence to be based on the best available record information.

D.  No Relief is Appropriate on CPZ's Claim Challenging the Surrogate Value of Roller-Quality
Steel Wire Rod of Circular Cross Section

Commerce valued another of CPZ's factors of production, roller-quality steel wire rod of circular cross section, using GTA data pertaining to imports from Thailand made during the POR under Thai HTS subheading 7228.50.10.  *Decision Mem.* 34-35; CPZ's Mem. 31 (citing *Final Analysis Mem. - PBCD* Attach. 1).  These data yielded an AUV of $2,530 per metric ton.  CPZ's Mem. 31 (citing *Final Analysis Mem. - PBCD* Attach. 1).  Commerce described Thai HTS subheading 7228.50.10 as pertaining to the article description "Other bars and rods of other alloy steel; angles, shapes and sections, of other alloy steel; hollow drill bars and rods, of alloy or non-alloy steel; Other bars and rods, not further worked than cold-formed or cold-finished: Of circular cross-section."  *Decision Mem.* 34-35 n.106.

Commerce chose to use the Thai data over several other sources.  The record contains data pertaining to imports from Indonesia classified under Indonesian HTS subheading 7228.50, which shows an AUV of $1,633 per metric ton, and Philippine import data showing an AUV of

$1,799 per metric ton.  CPZ's Mem. 31 (citing *Letter from PBCD to Sec'y of Commerce*, at Ex. 5 (Jun. 16, 2010) (Admin. R. Doc. No. 5770)).  The article description for HTS subheading 7228.50 differs from the article description of Thai HTS subheading 7228.50.10 in that it is not specific to articles "[o]f circular cross-section."  Commerce also declined to use data pertaining to imports into the United States under subheading 7228.50.10.10, HTSUS, which reflected an AUV of $1,881 per metric ton.  *Id*.  The article description for subheading 7228.50.10.10, HTSUS, does not specify circular cross-section but includes the descriptive words "[o]f tool steel (other than high-speed steel): of ball-bearing steel."  Finally, Commerce rejected an Indian company's financial data, which showed a value of $1,564 per metric ton.  *Id.*  This publicly available data, placed on the record by Timken, is taken from the company's 2008-2009 annual report, which covered the fiscal year April 1, 2008 through March 31, 2009.  *Letter from Timken to Sec'y of Commerce*, at Ex. 13, p. 33 (Dec. 17, 2009) (Admin. R. Doc. No. 5692).  The company, ABC Bearings Limited ("ABC"), is a producer of TRBs, cylindrical roller bearings, and slewing bearings.  *Id*.  The data presented in the annual report, which the Department used for purposes of calculating financial ratios, includes the value and quantity for steel consumed by ABC for the fiscal year, which CPZ converted to U.S. dollars/metric ton.  *Id*.; CPZ's Mem. 31; *CPZ's Case Br.* 29.  The annual report does not specify whether the input relied upon is roller-quality steel wire rod of circular cross section, which is the input used by respondents in the production of subject TRBs.

CPZ claims that Commerce failed to use the best available information to value the roller-quality steel wire rod.  CPZ's Mem. 31-32.  The statute defines "best available information" as information from "one or more market economy countries that are . . . at a level of economic development comparable to that of the nonmarket economy country, and . . .

significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). CPZ argues that

Commerce "erred in refusing to consider data from other surrogate countries, including U.S.

import data." CPZ's Mem. 31. It argues that the Thai HTS data showed an aberrationally high

value for steel wire rod and that Commerce instead should have based the surrogate value on the

Indonesian data. *Id.* at 32. The court determines that the Department's determination rests on

substantial evidence and must be affirmed.

The Department's explanation does not directly address the issue of whether the Thai

HTS data are the "best available information" as required by § 1677b(c)(1). In the Decision

Memorandum, Commerce explained that it would continue to value roller-quality steel wire rod

using the Thai HTS data, which it had used in the Preliminary Results, because CPZ had not "put

forth a colorable claim, based on record evidence, that the Thai import data are inappropriate,"

such that Commerce would perform its "benchmarking" analysis. *Decision Mem.* 34-35.

Commerce explained that neither the U.S. import data nor the financial data of the Indian

company provided "suitable comparative price benchmarks to test the validity of selected SVs,"

referring to statements earlier in the Decision Memorandum explaining that the Department

seeks broad-based price averages and does not consider it appropriate to use information from

countries at a dissimilar level of economic development to China as "benchmark" data. *Id.* at 35.

Commerce also explained that the uncorroborated lower prices reflected by the Indonesian and

Filipino data also did not constitute "sufficient evidence to compel the Department to question

the validity of the more-specific eight-digit data used in the *Preliminary Results*." *Id.* (footnote

omitted). Commerce concluded by stating that it continued to find that the Thai HTS data were

the "most specific to the input in question, as this HTS category values steel rod of circular cross

section, which is the type of wire rod used in the production of TRBs by the respondents." *Id.*

By addressing only whether CPZ made an adequate showing under the Department's "benchmarking" practice, Commerce failed to directly address the relevant inquiry under the statute: whether the record supports the Department's determination that the Thai HTS data were the best available information.

Nevertheless, the court concludes that the record contains adequate evidentiary support for the Department's determination that the Thai HTS data should be used to value the steel wire rod input.  The record shows that, consistent with the Department's finding, the Thai HTS data pertained to steel wire rod of circular cross-section, unlike any of the alternative data sources. The record also supports the Department's conclusion that the Thai HTS data were superior to the U.S. data based on the statutory requirement that Commerce use, to the extent possible, information from countries "at a level of economic development comparable to that of the nonmarket economy country."  19 U.S.C. § 1677b(c)(4).  Commerce determined in the Preliminary Results that Thailand and China were at comparable levels of economic development.  *Prelim. Results*, 75 Fed. Reg. at 41,149-50.  Finally, Commerce validly concluded that the Thai HTS data were superior to the data of a single Indian company because the Thai HTS data represented a broad-based market average and that the Indian data were not specific to the input at issue.

E.  No Relief is Appropriate on Timken's Claim Challenging the Department's
Determination of the Appropriate U.S. Sale

Timken claims that SKF's acquisition of Peer Bearing Company on September 11, 2009 constituted a sale in the United States of the latter's then-unsold inventory of subject merchandise from CPZ to SKF and that Commerce should have used this sale, rather than subsequent downstream sales to individual customers, when determining the U.S. price of this subject merchandise for purposes of calculating margins for CPZ and SKF.  Timken's

Mem. 16-22.  In support of its claim, Timken argues that "[w]hile there are often a series of sales

before the ultimate purchase for consumption, the statute specifies that the *first sale* to an

unaffiliated U.S. customer at arm's length is the proper measure of the United States price."

*Id.* at 17 (citing 19 U.S.C. § 1677a(a), (b) (defining "export price" and "constructed export

price," respectively)).  Timken submits that a sale is, by definition, a transfer of ownership for

compensation and that "[s]o long as a U.S. transaction is comprised of a seller affiliated with the

producer or exporter, an unaffiliated U.S. purchaser, and the transfer of ownership of subject

merchandise for some consideration, it is a sale subject to the dumping laws."  *Id.* at 19 (citing

19 U.S.C. § 1677a(a)-(b)).  According to Timken, CPZ sold the bearings in its inventory to an

unrelated party, SKF, in the United States, for consideration, and "[t]he sale of these bearings

meets all the statutory requirements of a constructed export price sale."  *Id.* at 21.  Timken

concludes that "Commerce's use of subsequent U.S. sales of the TRBs in that inventory to

determine dumping was not supported by substantial evidence and should be rejected by this

Court."  *Id.* at 21.  The court does not find merit in this claim.

Commerce found that the Master Purchase Agreement ("MPA") "specifies the details of

the share transfer between ownership parties upon finalization of the acquisition agreement,

which resulted in the transfer of ownership of various Spungen-owned companies, including

PBCD/Peer and PBCD/CPZ, to various AB SKF-owned affiliates."  *Decision Mem.* 23 (quoting

*Prelim. Results*, 75 Fed. Reg. at 41,152-53).  Commerce concluded from the MPA that "there

was no sale value specifically associated with just the TRB inventory as part of the MPA or any

other document submitted to the record."  *Id.* at 22 (quoting *Prelim. Results*, 75 Fed. Reg.

at 41,153).  Commerce observed that "while the transfer of stock ownership of Peer Bearing

Company from one entity to another would necessarily result in the new ownership acquiring the

company, along with all assets of said company (including inventory assets), at no point in the

MPA document (or in any other document on the record) is there any explicit or implicit

reference to the valuation of inventory assets as part of the actual purchase agreement . . . ." *Id.*

at 23-24.  From its own examination of the MPA, the text of which is proprietary, the court

concludes that the Department's findings are supported by substantial evidence.

Timken does not identify record evidence that is sufficient to refute the Department's

finding that no agreed-upon sale price specific to the TRB inventory is set forth in the MPA or

any other document submitted to the record.  Identifying MPA provisions and associated record

documents describing the valuation of the inventory, Timken argues that "[v]arious

representations and covenants in the MPA and Assignment agreement, in particular, establish the

terms governing PBCD's inventory sale."  Timken's Mem. 19 (citations omitted).  Timken

concludes from the record documents that "[t]hese provisions make clear that the parties

contemplated that the MPA was to constitute a binding agreement for the sale of PBCD's

business and the goods it held in inventory to SKF."  *Id.* at 20 (citations omitted).  Timken

references a general warranty regarding "Inventory," a covenant regarding continued ordinary

business operations, and a promise made with respect to the tax treatment of the acquisition,

according to which the parties would make certain tax elections consistent with an asset sale as

opposed to a share sale.  *Id.* at 19-20 (citing *Letter from SKF to Sec'y of Commerce*, at 4, 8-10

(Jun. 9, 2010) (Admin. R. Doc. No. 5769)); The Timken Co.'s Reply Br. in Supp. of its Mot. for

J. on the Agency R. 4-5 (Dec. 12, 2011), ECF No. 78 ("Timken's Reply").

Timken's argument, based on what Timken considers to be terms of the sale of inventory,

is not convincing.  There is no dispute that the inventory at issue was transferred as part of the

share acquisition.  As Commerce found, the record does not contain evidence showing that the

parties agreed or intended to agree upon a separate price for the transfer of the TRBs in the

inventory held by Peer Bearing Company when negotiating the acquisition.  Although asserting

that the inventory transfer was made for consideration, Timken does not demonstrate from record

evidence that Commerce erred in concluding that separate consideration was not negotiated for

that inventory.[13]  In the absence of such separate consideration, Commerce was within its

statutory authority in determining that a sale of the inventory did not occur for purposes of

determining U.S. price.[14]

       Finally, Timken argues that the Department's decision that the SKF acquisition did not

constitute a sale to an unaffiliated party was invalid because it was based on a reason not found

in the statute: that the acquisition was not a sale "for consumption."  Timken's Mem. 16-17.

Timken bases this argument on a sentence in the Decision Memorandum in which Commerce

rejected the need to request additional information regarding the SKF acquisition by stating that

"[b]ecause we do not find that this transfer of inventory constitutes a sale of subject merchandise

---

[13] With respect to the valuation of the inventory, Commerce addressed certain record
documentation in the Preliminary Results, stating that "[Changshan Peer Bearing Company,
Ltd. and Peer Bearing Company (collectively, "SKF")]  reported sales prices for the
inventory based on an accounting value it obtained from a third party accounting firm for
financial reporting purposes subsequent to the acquisition," adding that "[t]hus, the value
reported by SKF is not reflective of negotiated sales prices for this merchandise."  *Tapered
Roller Bearings & Parts Thereof, Finished or Unfinished, From the People's Republic of
China: Prelim. Results of the 2008-2009 Admin. Review of the Antidumping Duty Order*,
75 Fed. Reg. 41,148, 41,153 (July 15, 2010).  Nothing in the Final Results or the
incorporated Decision Memorandum departed from this determination.

[14] The Timken Company ("Timken") argued before Commerce during the review that
CPZ and SKF did not submit important documents that might have been relevant to the sale
of assets pursuant to the acquisition and that Commerce, accordingly, should determine
constructed export price of the inventory using the reported entered value of that subject
merchandise as partial AFA ["adverse facts available"; *see* 19 U.S.C. § 1677e(a), (b)].
*Decision Mem.* 21-22 (citations omitted).  Timken does not make this precise argument
before the court, arguing only generally that the Department may use facts otherwise
available to the extent that any pricing information is missing from the record.  The Timken
Co.'s Reply Br. in Supp. of its Mot. for J. on the Agency *R.* 7 (Dec. 12, 2011), ECF No. 78.

*for consumption* to the first unaffiliated customer . . . , we do not agree with Petitioner that there

is no viable sales price on the record." *Decision Mem.* 24 (emphasis added).  This argument fails

for two reasons.  First, as discussed above, Commerce determined from substantial record

evidence that the SKF acquisition did not constitute a sale of the TRBs in inventory because no

specific price was negotiated for that inventory.  The Decision Memorandum's reference to a

sale for consumption was not necessary to the Department's determination.  Second, the reason

why Commerce chose not to request additional information would be pertinent were Timken

claiming here that Commerce acted unlawfully in failing to request additional information on the

transfer of the inventory.  Timken made a related argument before Commerce during the review

but is not arguing that point before the court.

### F.  Relief is Appropriate on Timken's Claim Challenging the Department's Using SKF's Factors of Production to Value Merchandise Produced by Pre-Acquisition CPZ

In determining normal value according to the nonmarket economy country procedure of

19 U.S.C. § 1677b(c)(1), Commerce requested individual sets of data on factors of production

from PBCD (on behalf of pre-acquisition CPZ) and from post-acquisition CPZ, *i.e.* SKF.

Timken's Mem. 12 (citation omitted).  For subject merchandise that was imported before the

acquisition but sold after the acquisition, Commerce used post-acquisition factors of production,

*i.e.*, factors of production pertaining to SKF, not CPZ.  *Id.*; Def.'s Mem. 27.  Timken claims that

this was unlawful because Commerce was expressly required by 19 U.S.C. § 1677b(c)(1) to

value of the factors of production "utilized in producing the merchandise."  Timken's

Mem. 22-27.  According to Timken, the factors of production for the post-acquisition producer,

SKF, could not possibly have been those actually utilized in producing the merchandise, which

was produced by CPZ.  *Id.* at 12.

Timken admits it failed to exhaust administrative remedies on its claim, having made no objection to the Department's use of post-acquisition factors of production in the case brief it submitted to Commerce during the review.  Timken's Reply 7.  Instead, Timken raised the issue for the first time in its rebuttal brief before Commerce (in a footnote) and then raised the issue again in a ministerial error allegation after the publication of the Final Results.  Def.'s Mem. 27-28 (citing *Timken's Rebuttal* at 7 n.1); *Letter from Timken to the Sec'y of Commerce* (Jan. 19, 2011) (Admin. R. Doc. No. 6034).  Timken requests that the court waive the failure to exhaust because this claim presents a purely legal question and "a serious error of law." Timken's Reply 7-8.  Defendant argues that failure to exhaust administrative remedies should bar relief on Timken's claim, relying on *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010) and 19 C.F.R. § 351.309(d)(2), in which Commerce has provided by regulation that "the rebuttal brief may respond only to arguments raised in case briefs."  Def.'s Mem. 27.

As provided by statute, "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."  Customs Courts Act, § 301, 28 U.S.C. § 2637(d) (2006).  Here, there is no question that a failure to exhaust administrative remedies occurred. Nevertheless, the issue presented is whether it is "appropriate" to require exhaustion of administrative remedies in the circumstance presented.  In deciding this question, the court may exercise a measure of discretion.  *See Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007).  An exception to the exhaustion requirement has been recognized when the issue presented is a "pure legal question."  *Id*. at 1378-79 & n.4.  That exception is applicable here.  The issue presents no question of fact.  Commerce determined, and no party contested, that SKF was not the successor in interest to CPZ, and Commerce treated the companies as separate respondents in the review.  *Final Results*, 76 Fed. Reg. at 3,087.  Commerce collected separate

FOP information for both.  *Prelim. Results*, 75 Fed. Reg. at 41,148-49.  The only question to be resolved is whether, on these uncontested facts, Commerce acted inconsistently with 19 U.S.C. § 1677b(c)(1) in using the FOP data it obtained from SKF to value subject merchandise produced by CPZ.

Defendant-Intervenor SKF addresses Timken's claim on the merits, arguing that "the statute does not require that the FOPs correspond to the factors used to produce the merchandise sold during the POR" and that the term "factors of production utilized in producing the merchandise" is ambiguous and was interpreted reasonably by Commerce in this case. Def.-Ints.' Resp. to Pl.'s R. 56.2 Mot. for J. upon the Agency R. 14 (Oct. 28, 2011), ECF No. 55. Defendant, however, does not argue, as an alternative to its exhaustion argument, that Commerce acted within its statutory authority in deciding to use the SKF factors of production.  The Decision Memorandum does not address the issue, and the only determination Commerce made with respect to Timken's claim is that the claim was not a proper allegation of a ministerial error. *Mem. to Dir., AD/CVD Operations Office*, at 4 (Feb. 18, 2011) (Admin. R. Doc. No. 6086). Before considering SKF's argument, the court considers it appropriate that Commerce, upon reconsidering the Department's decision to use SKF's FOP data, first address the merits of Timken's argument in the redetermination it issues upon remand in response to this Opinion and Order.

### III.  CONCLUSION AND ORDER

For the reasons explained above, the court concludes that: (1) Commerce must reconsider its decision to treat the TRBs exported to the United States from Thailand as products of China and redetermine the country of origin of these TRBs; (2) no relief is appropriate on CPZ's claim challenging the assessment rate applied to pre-acquisition entries; (3) Commerce must reconsider

and redetermine its surrogate value for bearing-quality steel bar; (4) no relief is appropriate on

the claim challenging the surrogate value of roller-quality steel wire rod; (5) no relief is

appropriate on Timken's claim challenging the Department's determination of the appropriate

sale for antidumping duty purposes; and (6) Commerce must reconsider and explain the

Department's decision to use SKF's data on factors of production for subject merchandise

imported prior to the acquisition.

      Therefore, upon consideration of all proceedings in this case and upon due deliberation, it

is hereby

      **ORDERED** that the final determination of the International Trade Administration,
U.S. Department of Commerce ("Commerce" or the "Department") in *Tapered Roller Bearings
& Parts Thereof, Finished & Unfinished, From the People's Republic of China: Final Results of
the 2008-2009 Antidumping Duty Admin. Review*, 76 Fed. Reg. 3,086 (Jan. 19, 2011) ("*Final
Results*") be, and hereby is, remanded for reconsideration and redetermination in accordance
with this Opinion and Order; it is further

      **ORDERED** that, on remand, Commerce shall issue a Remand Redetermination that
recalculates the weighted-average dumping margin of Peer Bearing Company-Changshan
("CPZ") as required to fulfill the directives of this Opinion and Order, is supported by substantial
evidence on the record, and is in all respects in accordance with law; it is further

      **ORDERED** that Commerce must reconsider the challenged country of origin
determination and redetermine the country of origin of the tapered roller bearings ("TRBs") that
were exported to the United States from Thailand and, on remand, must base its country of origin
determination solely on criteria and factors that are shown to be relevant to the issue of whether
the parts exported from China to Thailand were substantially transformed by the processing,
including assembly, that occurred in Thailand; it is further

      **ORDERED** that Commerce must redetermine the surrogate value that it applied to
CPZ's input of bearing-quality steel bar using the best available record information; it is further

      **ORDERED** that Commerce must reconsider its decision to value pre-acquisition-
produced subject merchandise using factors of production pertaining to the post-acquisition
producer and show that its decision on remand accords with 19 U.S.C. § 1677b(c)(1) (2006); and
it is further

      **ORDERED** that Commerce must file the Remand Redetermination with the court within
ninety (90) days of the date of this Opinion and Order, that each plaintiff and defendant-
intervenor shall have thirty (30) days from the filing of the Remand Redetermination in which to

file with the court comments on the Remand Redetermination, and that defendant shall have thirty (30) days from the last filing of such comments in which to file with the court any responses to the comments of other parties.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: December 21, 2012
        New York, New York