Slip Op. 14 - 62

## UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| **PEER BEARING COMPANY-CHANGSHAN**, <br><br> Plaintiff, <br><br> v. <br><br> **UNITED STATES**, <br><br> Defendant, <br><br> and <br><br> **THE TIMKEN COMPANY**, <br><br> Defendant-intervenor. |

Before: Timothy C. Stanceu, Judge

Consol. Court No. 11-00022

### OPINION AND ORDER

[Affirming in part and remanding in part a decision of the U.S. Department of Commerce in an action contesting the final results of an administrative review of an antidumping duty order on tapered roller bearings from China]

Dated: June 10, 2014

*John M. Gurley* and *Diana Dimitriuc Quaia*, Arent Fox LLP, of Washington, DC, for plaintiff and defendant-intervenor Peer Bearing Company-Changshan.

*L. Misha Preheim*, Trial Attorney, and *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With them on the brief were *Stuart F. Delery*, Assistant Attorney General, and *Jeanne E. Davidson*, Director. Of counsel on the brief was *Joanna V. Theiss*, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

*Herbert C. Shelley* and *Christopher G. Falcone*, Steptoe & Johnson LLP, of Washington, DC, for defendant-intervenors Changshan Peer Bearing Company Ltd. and Peer Bearing Company.

*William A. Fennell*, *Terence P. Stewart*, and *Stephanie R. Manaker*, Stewart and Stewart, of Washington, DC, for plaintiff and defendant-intervenor The Timken Company.

Stanceu, Judge: This consolidated case arose from challenges to the final determination

("Final Results") that the International Trade Administration, U.S. Department of Commerce

("Commerce" or the "Department") issued to conclude the twenty-second periodic

administrative review of an antidumping duty order (the "Order") on tapered roller bearings

("TRBs") and parts thereof, finished and unfinished, from the People's Republic of China

("China" or "PRC"). *Tapered Roller Bearings & Parts Thereof, Finished & Unfinished, From*

*the People's Republic of China: Final Results of the 2008-2009 Antidumping Duty Admin.*

*Review*, 76 Fed. Reg. 3,086 (Jan. 19, 2011) ("*Final Results*").  The twenty-second administrative

review pertained to entries of TRBs and parts thereof from China (the "subject merchandise")

occurring during the period of June 1, 2008 through May 31, 2009 (the "period of review" or

"POR").  *Id.*, 76 Fed. Reg. at 3,086.

Before the court is the decision ("Remand Redetermination") Commerce submitted in

response to the court's remand order in *Peer Bearing Co.-Changshan v. United States*,

36 CIT __, 884 F. Supp. 2d 1313 (2012) ("*Peer Bearing-Changshan*").  Final Results of

Redetermination Pursuant to Ct. Remand (May 13, 2013), ECF No. 100 (public version), ECF

No. 101 (confidential version) ("*Remand Redetermination*").[1]  For the reasons stated herein, the

court orders a second remand on two issues in this case and affirms the Remand Redetermination

on a third issue.

## I. BACKGROUND

Background is provided in the court's prior opinions and is supplemented herein.  *Peer*

*Bearing-Changshan*, 36 CIT at __, 884 F. Supp. 2d at 1317-18; *Peer Bearing Co.-Changshan v.*

---

[1] Unless otherwise specified, all citations to Final Results of Redetermination Pursuant to
Court Remand ("Remand Redetermination") filed on May 13, 2013 are to the public version,
ECF No. 100 ("*Remand Redetermination*").

*United States*, 35 CIT __, __, Slip Op. 11-125, at 2 (Oct. 13, 2011) (denying a motion to dismiss one of the claims brought in this consolidated action).

Plaintiffs Peer Bearing Company-Changshan ("CPZ"), a Chinese producer and exporter of TRBs, and its affiliated U.S. reseller, Peer Bearing Company, initiated the above-captioned matter to contest the Final Results. *See* Compl. (Feb. 2, 2011), ECF No. 6.  The Timken Company ("Timken"), a domestic TRB producer, initiated a separate action contesting the Final Results and is a defendant-intervenor in this action. *See* Compl. (Mar. 10, 2010), ECF No. 9 (Court No. 11-00039).  The two cases have since been consolidated. *See* Order (June 13, 2011), ECF No. 27 (consolidating *Timken Co. v. United States* (Court No. 11-00039) into the above-captioned matter).  The other defendant-intervenors are Changshan Peer Bearing Company Ltd., a new company formed after the shares of CPZ were acquired during the POR (on September 11, 2008) by various companies controlled by Swedish company SKF, and its affiliated U.S. reseller, also known as Peer Bearing Company, a new U.S. entity that was formed when the SKF companies acquired the former Peer Bearing Company at the same time they acquired CPZ. *See Peer Bearing-Changshan*, 36 CIT at __, 884 F. Supp. 2d at 1317.  CPZ and the former Peer Bearing Company are no longer in existence; each transferred its responsibilities for participating in antidumping proceedings to a separate company, PBCD, LLC, which also assumed liability for paying antidumping duties. *Id.*  Commerce determined that Changshan Peer Bearing Company Ltd., the new Chinese producer, and the new U.S. entity, Peer Bearing Company, are not successors in interest to the former entities, and as a result Peer Bearing Company-Changshan and Changshan Peer Bearing Company were separate respondents in the twenty-second review. *Id.*

In the Final Results, Commerce assigned a weighted-average antidumping duty margin of

38.39% to PBCD and a weighted-average antidumping duty margin of 14.13% to the new

exporter/producer, Changshan Peer Bearing Company, to which Commerce referred as "SKF".

*Id.* at __, 884 F. Supp. 2d at 1317-18.  In this Opinion and Order, the court also refers to

Changshan Peer Bearing Company as "SKF."  The court refers to the former producer and

respondent as "CPZ" and to the entity now litigating the claims brought by CPZ as "PBCD."

Pursuant to the court's remand order, Commerce filed the Remand Redetermination on

May 1, 2013.  The various parties have filed comments on the Remand Redetermination with the

court.  PBCD raises objections to the Remand Redetermination on one issue.  Pl. Peer Bearing

Co.-Changshan's Comments on Def.'s Final Results of Redetermination Pursuant to Ct. Remand

(June 12, 2013), ECF No. 106 (public version) ("PBCD's Comments").  SKF objects on two

issues.  Pls.' Comments on Final Results of Redetermination Pursuant to Remand

(June 12, 2013), ECF No. 103 ("SKF's Comments").  Timken supports the Remand

Redetermination in the entirety.  Comments on Final Results of Redetermination Pursuant to Ct.

Remand (June 12, 2013), ECF No. 105 ("Timken's Comments").  The changes Commerce made

in the Remand Redetermination resulted in a decrease of PBCD's margin from 38.39% to

22.82% and an increase in SKF's margin from 14.13% to 22.12%.  *See Remand*

*Redetermination* 68.

## II.  DISCUSSION

### A.  Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act

of 1980, 28 U.S.C. § 1581(c), pursuant to which the court reviews actions commenced under

section 516A of the Tariff Act of 1930 ("Tariff Act"), 19 U.S.C. § 1516a, including an action

contesting the final results of an administrative review that Commerce issues under section 751

of the Tariff Act, 19 U.S.C. § 1675(a).[2]  When reviewing the final results of an administrative

review, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise not in accordance with law. . . ."

19 U.S.C. § 1516a(b)(1)(B)(i).

<u>B.  Remaining Issues</u>

Three issues remain in dispute in this case.  In the Remand Redetermination, Commerce

addressed each of these issues and departed from the decision in the Final Results with respect to

two of them, as summarized below.

The first remaining issue is PBCD's challenge to the Department's decision that certain

TRBs resulting from processing and assembly operations conducted in Thailand by a CPZ

affiliate were of Chinese origin and therefore within the scope of the Order.  The court remanded

this issue for the Department's reconsideration, and in response, Commerce modified its

country-of-origin analysis in minor respects but again determined that the country of origin of

the TRBs in question was China.  *Remand Redetermination* 9-36, 45-58.  PBCD opposes the

origin determination on various grounds.  PBCD's Comments 3-19.  As discussed later in this

Opinion and Order, the court concludes that the Department's decision to include the TRBs

within the Order was contrary to law.

The second remaining issue is PBCD's challenge to the Department's surrogate value

determination for bearing-quality steel bar that PBCD used in producing TRBs.  In response to

the court's remand order in *Peer Bearing-Changshan*, Commerce calculated a new surrogate

value for the bearing-quality steel bar.  *Remand Redetermination* 36-39, 60-61, 63-67.  PBCD

---

[2] Unless otherwise specified, all statutory citations herein are to the 2006 edition of the
United States Code and all citations to regulations are to the 2011 edition of the Code of Federal
Regulations.

supports the redetermined surrogate value.  PBCD's Comments 3.  SKF opposes it on the ground

that Commerce should not have used a surrogate value but instead should have valued all steel

bar input using data pertaining to SKF's own market economy purchases of bearing-quality steel

bar.  SKF's Comments 12-16.  For the reasons discussed herein, the court sustains the

redetermined surrogate value.

The final remaining issue is Timken's challenge to the Department's determination of the

factors of production ("FOPs") used to calculate the normal value of certain TRBs that had been

manufactured by the former producer, CPZ, but were sold from SKF's acquired inventory by the

newly formed Peer Bearing Company.  Specifically, Timken claimed that Commerce incorrectly

used the FOPs pertaining to SKF and instead should have used the FOPs pertaining to CPZ

because CPZ had produced the merchandise in question.  *Peer Bearing-Changshan*, 36 CIT

at __, 884 F. Supp. 2d at 1338.  In the Remand Redetermination, Commerce recalculated the

normal value of the TRBs at issue using certain record FOP data pertaining to the brief period

between the beginning of the POR and the acquisition.  *Remand Redetermination* 39.  Timken

supports the decision Commerce made to resolve this issue.  Timken's Comments 1.  SKF

opposes it on various grounds.  SKF's Comments 3-12.  As discussed later in this Opinion and

Order, the court orders reconsideration of the decision, concluding that Commerce failed to

address the issue of which record data pertaining to CPZ was most appropriate for use in valuing

the factors of production.

C.  Commerce Erred in Finding that Certain TRBs Processed in Thailand Were Within the Scope
of the Antidumping Duty Order

In the Final Results, Commerce found that certain TRBs that had resulted from

processing conducted in Thailand by a PBCD affiliate were products of China and therefore

within the scope of the Order.  *Peer Bearing-Changshan*, 36 CIT at __, 884 F. Supp. 2d. at 1319.

The manufacturing operations performed in Thailand included grinding and honing of unfinished, Chinese-origin cups and cones and assembly operations using the finished cups and cones and Chinese-origin cages and rollers.  *Id.*  Commerce applied what it termed its "substantial transformation" test to reach a decision that it described as based upon a "totality of the circumstances."  *Id.*  In explaining how it reached its conclusion, Commerce discussed six criteria: (1) the class or kind of merchandise within the scope of the Order; (2) the nature and sophistication of the upstream processing (i.e., the processing conducted in China) and the third-country processing (i.e., the processing conducted in Thailand); (3) the identification of the processing that imparts the essential physical or chemical properties of a TRB; (4) the cost of production and value added by the third-country processing; (5) the level of investment in the third country and the potential for circumvention; and (6) whether unfinished and finished bearings are both intended for the same ultimate end use.  *Id.*  Commerce found that the TRBs had not been "substantially transformed" by operations in Thailand and thus were of Chinese origin and within the scope of the Order.  *Id.* at __, 884 F. Supp. 2d at 1319-20.

In *Peer Bearing-Changshan*, the court reviewed the Final Results and identified numerous deficiencies with the Department's decision.  *Id.* at __, 884 F. Supp. 2d at 1324-25. Among the deficiencies the court identified was the Department's failure to provide reasoning why its first criterion, "class or kind of merchandise," was relevant to the origin issue the case presents.  *Id.* at __, 884 F. Supp. 2d at 1320-23.  That question is, namely, "whether the Chinese-origin parts, finished and unfinished, which were converted into finished TRBs by the processing in Thailand, were 'substantially transformed' by that processing."  *Id.* at __, 884 F. Supp. 2d at 1320.  The court also criticized a finding Commerce reached under its sixth, "ultimate use" criterion, which was that an unfinished TRB is intended for the same ultimate end

use as a finished TRB.  *Id.* at __, 884 F. Supp. 2d at 1323-24.  Observing that the substantial

transformation issue presented by this case does not involve unfinished TRBs, the court took

issue with this finding.  *Id.* at __, 884 F. Supp. 2d. at 1324 ("No individual part exported from

China to Thailand plausibly could have been found to be an unfinished bearing, and Commerce

made no finding to that effect.").  Additionally, the court held that the record lacked substantial

evidence to support the Department's finding, under its fourth criterion, that no significant value

had been added to the finished TRBs as a result of the processing conducted in Thailand.  *Id.*

at __, 884 F. Supp. 2d. at 1322-23.  The court did not sustain the Department's country-of-origin

finding and directed Commerce to reconsider its determination in the entirety.  *Id.* at __, 884 F.

Supp. 2d. at 1324-25, 1339.  The court specified that "[a]ny determination Commerce reaches on

remand must rely solely on criteria relevant to whether the parts exported to Thailand were

substantially transformed and must be based on findings supported by substantial record

evidence."  *Id.* at __, 884 F. Supp. 2d. at 1325.

       In the Remand Redetermination, Commerce again determined that the TRBs processed in

Thailand are products of China and, therefore, within the scope of the Order.  *Remand

Redetermination* 9-10.  Although Commerce discussed the deficiencies the court identified in

*Peer Bearing-Changshan*, the Remand Redetermination, despite the court's order to rely solely

on relevant criteria, made no essential changes to the criteria Commerce applied previously.

       On remand, Commerce again concluded that its first criterion, "class or kind/scope," was

relevant to its origin determination and "weighs against a finding of substantial transformation

where the upstream and downstream products are within the same class or kind/scope."  *Remand

Redetermination* 11.  In response to the court's order, Commerce gave reasoning for its

conclusion, stating that "the class or kind/scope criterion is relevant to a country-of-origin

analysis because if the downstream product becomes a different class or kind of product, or falls

outside the scope of the order, this weighs in favor of a finding that the product is a new and

different article of commerce (i.e., substantially transformed) in the third country."  *Id.* at 10

(footnote omitted).  Commerce also stated that its conclusion under its first criterion "is not

definitive of the ultimate question," reasoning that "[t]he Court is correct to note that, as the

Department itself noted in the prior review, the central issue is whether the unfinished

components shipped by PBCD to Thailand for further processing and assembly are substantially

transformed, not whether the inputs and outputs of Thai processing are both products included in

the scope of the *TRBs Order*."  *Id.* at 11.

        Commerce proceeded to find that the remaining five criteria ("nature/sophistication of

processing," "physical/chemical properties and essential component," "cost of production/value

added," "level of investment," and "ultimate use") also "suggested against a finding that the Thai

processing constitutes substantial transformation."  *Id.* at 45.

        Commerce made new findings to respond to the court's ruling that record evidence did

not support the Department's earlier finding, made under the fourth, "cost of production/value

added" criterion, that no significant value had been added to the finished TRBs as a result of the

processing conducted in Thailand.  Commerce reported in the Remand Redetermination that it

calculated three weighted-average per-unit cost of production ("COP") ratios to determine the

value added in Thailand, each of which it derived by dividing the sum of the reported

manufacturing labor and overhead costs incurred in Thailand by the sum of those costs and the

COP incurred in China, which included materials costs as well as manufacturing labor and

overhead.  *Id.* at 21-22.  Commerce calculated three separate ratios because it performed the

calculations using COP-related data (which were on the record but not used for this purpose in

the Final Results) for (1) CPZ-produced TRBs sold by the CPZ-affiliated Peer Bearing Company

prior to the acquisition, (2) CPZ-produced TRBs imported prior to the acquisition and sold,

post-acquisition, by the SKF-affiliated Peer Bearing Company, and (3) TRBs that SKF produced

post-acquisition that were then sold by the SKF-affiliated Peer Bearing Company.  *Remand*

*Redetermination* 22.

It appears from the Remand Redetermination that Commerce used actual COP data for

the Thai operations but, contrastingly, used surrogate values to value the factors of production

for operations that occurred in China, modified according to the changes it made on remand to

the bearing-quality steel surrogate value and to the factors of production for CPZ-produced

TRBs that were sold post-acquisition.  *Id.* at 22-23.  With respect to the ratios, Commerce stated

that it did not find that the percentages it calculated were "representative of a significant value

added by the Thai further processing."[3]  *Id.* at 23.  With respect to "qualitative" (as opposed to

quantitative) value-added information, Commerce found that "the grinding and assembly

processes (whether they take place in the PRC or Thailand) are relatively minor compared with

the totality of the upstream processes."  *Id.* at 25.  Commerce further found that "the value of

energy and labor consumed by the Thai processor in the grinding and assembly of TRB

components is insignificant when compared to the total value of the finished merchandise."  *Id.*

at 26.

Pursuant to its fifth criterion, "level of investment in the third country and the potential

for circumvention," the Remand Redetermination "considered the production equipment used in

each stage of production in the PRC and in Thailand in order to make a finding concerning the

---

[3] The actual ratios appear in the confidential version of the Remand Redetermination but
are not presented in this Opinion and Order due to a claim for proprietary treatment.

level of investment." *Remand Redetermination* 30.  Commerce "determined that the

equipment/production line requirements for the processes performed in Thailand are not

significant in comparison to those required for the production stages completed in the PRC." *Id.*

Under its sixth criterion, which pertained to "ultimate end use," the Remand

Redetermination altered the analysis presented in the Final Results to change the focus from

"unfinished" TRBs to the unfinished and finished parts.  As Commerce stated in the Remand

Redetermination, "once the issue is reframed to focus on the parts (rather than the 'unfinished

TRB'), the criterion becomes relevant to the analysis because the ground and un-ground (but

unassembled) component TRB parts are intended for the same ultimate end use as the finished

and assembled TRB: as a finished TRB that can be used in a downstream product." *Id.* at 35.

PBCD continues to oppose the Department's country-of-origin determination.  PBCD's

Comments 3-19.  PBCD argues, *inter alia*, that the Department's "substantial transformation"

analysis on remand "raises many of the same concerns in the Court's Remand Order," *id.* at 4,

and that the Department's conclusions therein "remain unsupported by a persuasive rationale,"

*id.* at 7.  PBCD further contends that the Department's analysis on the country-of-origin question

should have reflected "industry practice and the twenty years of country of origin practice by

U.S. Customs and Border Protection."  PBCD's Comments 7.  Timken supports the

Department's determination but offers no specific comments on the issue.  *See* Timken's

Comments.

#### 1.  Commerce is Authorized to Interpret, But Not Enlarge, the Scope of an Antidumping Duty Order, Unless it Invokes its Anticircumvention Authority

The general rule is that Commerce, when determining whether merchandise falls within

the scope of an existing antidumping duty order, may interpret the scope language of the order

but may not modify it.  *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1097 (Fed.

Cir. 2002) ("*Duferco*").  Under this general rule, Commerce may not place merchandise within

the scope of an order if the scope language may not reasonably be interpreted to include that

merchandise.  *Id.*, 296 F.3d at 1089 ("Scope orders may be interpreted as including subject

merchandise only if they contain language that specifically includes the subject merchandise or

may be reasonably interpreted to include it.").  The question posed by this case is whether the

term from the scope language, "imports of tapered roller bearings *from the PRC*," reasonably can

be interpreted to include the TRBs in question.[4]  *Notice of Antidumping Duty Order; Tapered*

*Roller Bearings & Parts Thereof, Finished or Unfinished, From the People's Republic of China*,

52 Fed. Reg. 22,667 (June 15, 1987) (emphasis added) ("*Antidumping Duty Order*").

 The general rule that Commerce may construe but not modify the scope of an existing

order is subject to a statutory exception, for in certain specified situations, Commerce may

---

 [4] In the Final Results, the International Trade Administration, U.S. Department of
Commerce ("Commerce" or the "Department") stated that the relevant antidumping duty order
applies to "shipments of tapered roller bearings and parts thereof, finished and unfinished, from
the [People's Republic of China ("PRC")]; flange, take up cartridge, and hanger units
incorporating tapered roller bearings; and tapered roller housings (except pillow blocks)
incorporating tapered rollers, with or without spindles, whether or not for automotive use."
*Tapered Roller Bearings & Parts Thereof, Finished & Unfinished, From the People's Republic
of China: Final Results of the 2008-2009 Antidumping Duty Admin. Review*, 76 Fed. Reg. 3,086,
3,087 (Jan. 19, 2011) ("*Final Results*").  The actual text of the original order varies slightly from
the Department's characterization in the Final Results.  Referring to "imports of tapered roller
bearings from the PRC," the order in its original form contains the following scope language:

> The products covered by this investigation are tapered roller bearings and
> parts thereof, currently classified in Tariff Schedules of the United States (TSUS)
> item numbers 680.30 and 680.39; flange, take up cartridge, and hanger units
> incorporating tapered roller bearings, currently classified in TSUS item 681.10;
> and tapered roller housings (except pillow blocks) incorporating tapered rollers,
> with or without spindles, whether or not automotive use, currently classified in
> TSUS item number 692.32 or elsewhere in the TSUS.

*Notice of Antidumping Duty Order; Tapered Roller Bearings & Parts Thereof, Finished or
Unfinished, From the People's Republic of China*, 52 Fed. Reg. 22,667 (June 15, 1987).  The
text of the original order mentions "unfinished" tapered roller bearings and parts only in the
title.  *Id.*

enlarge the scope of an order by invoking the "prevention of circumvention" provisions

contained in section 781 of the Tariff Act, 19 U.S.C. § 1677j. *See AMS Assoc. v. United States*,

737 F.3d 1338, 1343 (Fed. Cir. 2013) ("In order to prevent circumvention, 19 U.S.C.

§§ 1677j(a)-(d) authorize Commerce to expand the scope of existing antidumping and

countervailing duty orders to reach products that are not covered by the existing scope . . ."); 

*Duferco*, 296 F.3d at 1098 ("So too the very existence of section 1677j of Title 19 emphasizes

the general requirement of defining the scope of antidumping and countervailing duty orders by

the actual language of the orders.").

        The antidumping duty statute does not speak generally to the question of how Commerce

is to interpret the scope language of an order when the question is whether a good should be

considered to be a good or "from" the country named in that order.  But in paragraphs (A) and

(B) of § 1677j(b)(1), the statute specifically addresses the situation in which a good imported

into the United States is completed or assembled in a "third country," i.e., a country other than

the country named in the order.  These provisions describe merchandise "imported into the

United States" that "is of the same class or kind" as merchandise named in an antidumping duty

order and is, before such importation, "completed or assembled" in a third country from

merchandise that is "subject to such order" or "produced in the foreign country with respect to

which such order . . . applies."[5]  19 U.S.C. § 1677j(b)(1)(A), (B).

_____

        [5] 19 U.S.C. § 1677j(b)(1) provides, in pertinent part, as follows:

**(b) Merchandise completed or assembled in other foreign countries**
    **(1) In general**
     If—
        (A) merchandise imported into the United States is of the same class or kind as any
        merchandise produced in a foreign country that is the subject of—
            (i) an antidumping duty order issued under section 1673e of this title, . . .
        (B) before importation into the United States, such imported merchandise is completed or
(continued…)

In the situation described by paragraphs (A) and (B) of § 1677j(b)(1), Commerce is empowered to "include such imported merchandise within the scope of such order . . . at any time such order . . . is in effect," *id.* § 1677j(b)(1), provided three conditions are met.[6]  Those conditions, set forth in paragraphs (C)-(E), are that "the process of assembly or completion in the foreign country . . . is minor or insignificant," *id.* § 1677j(b)(1)(C), "the value of the merchandise produced in the foreign country to which the antidumping duty order applies is a significant portion of the total value of the merchandise exported to the United States," *id.* § 1677j(b)(1)(D), and Commerce "determines that action is appropriate under this paragraph to prevent evasion of such order . . . ," *id.* § 1677j(b)(1)(E).

---

(continued…)

assembled in another foreign country from merchandise which—
    (i) is subject to such order . . . , or
    (ii) is produced in the foreign country with respect to which such order . . . applies,
(C) the process of assembly or completion in the foreign country . . . is minor or insignificant,
(D) the value of the merchandise produced in the foreign country to which the antidumping duty order applies is a significant portion of the total value of the merchandise exported to the United States, and
(E) the administering authority determines that action is appropriate under this paragraph to prevent evasion of such order . . . ,
the administering authority, after taking into account any advice provided by the [International Trade] Commission under subsection (e) of this section, may include such imported merchandise within the scope of such order . . . at any time such order . . . is in effect.

19 U.S.C. § 1677j(b)(1) (emphasis in original).

[6] The statute imposes as a fourth condition that Commerce, before including the merchandise within the scope of the antidumping duty order, "take into account" any advice the International Trade Commission provides after Commerce provides the Commission with notice of the intended action.  19 U.S.C. § 1677j(b)(1).  Nonetheless, the Department's decision on whether the merchandise is within a category for which notice is required is not subject to judicial review.  *Id.* § 1677j(e)(1).  Additionally, in deciding whether to expand an order to include the merchandise in question, Commerce is to "take into account such factors as—the pattern of trade, including sourcing patterns," whether the two producers are affiliated, and whether imports of the merchandise increased after the investigation resulting in the order.  *Id.* § 1677j(b)(3).

Paragraphs (A) and (B) of 19 U.S.C. § 1677j(b)(1) describe precisely the factual situation

presented by this case.  The TRBs at issue were assembled in the third country (here, Thailand),

if not also "completed" there.[7]  *Id.* § 1677j(b)(1)(B).  The unfinished cups and cones and the

finished cages and rollers were, in the words of § 1677j(b)(1)(B), "merchandise which . . . is

subject to such order" as well as merchandise "produced in the foreign country with respect to

which such order . . . applies."  *Id*.

In the Final Results, Commerce "found no potential for evasion" of the Order and

"avoided any reliance on its anticircumvention authority . . . ."  *Peer Bearing-Changshan*,

36 CIT at __, 884 F. Supp. 2d. at 1321.  In the Remand Redetermination, Commerce again

indicated that it was not performing an anticircumvention analysis under 19 U.S.C. § 1677j(b).

*Remand Redetermination* 34 ("we clarify that we do not reach a determination as to whether

circumvention had occurred or may occur . . . .").[8]  Accordingly, Commerce lacked authority to

expand the scope of the Order in deciding the question of whether the TRBs assembled and

completed in Thailand were within that scope.  Any "substantial transformation criteria" or

"totality of the circumstances test" Commerce used to decide that question was required to be

consistent with the limitations on the Department's authority.  To summarize, those limitations

stem from two sources: the scope language of the Order itself ("imports of tapered roller

---

[7] The TRBs were "completed" in Thailand only in the sense that they required no further
processing before exportation to the United States.  Describing them as "completed" in Thailand
implies that the operations in Thailand were performed on incomplete bearings from another
country (here, China), which was not the case.

[8] In response to an inquiry by defendant, the court clarified that *Peer Bearing
Co.-Changshan v. United States*, 36 CIT __, 884 F. Supp. 2d 1313 (2012) ("*Peer Bearing-
Changshan*") was not intended to, and does not, order Commerce to conduct an analysis under
19 U.S.C. § 1677j(b).  Order Granting Extension of Time for Filing of Remand Results and
Clarifying Scope of Remand Order (Mar. 28, 2013), ECF No. 99.

bearings from the PRC"), which Commerce must interpret reasonably and not expansively, and

19 U.S.C. § 1677j(b).  Both sources cast doubt on the Department's decision.

<u>2.  The Plain Meaning of the Scope Language Contained in the Order Does Not Support the
Department's Decision</u>

The imported bearings at issue were not, in any literal or ordinary sense, "imports of

tapered roller bearings from the PRC" as described in the scope language of the Order.

*Antidumping Duty Order*, 52 Fed. Reg. 22,667.  It was in Thailand, not China, that the imported

merchandise became "tapered roller bearings," for, as discussed in *Peer Bearing-Changshan*, no

part that was exported from China to Thailand plausibly could be described as an unfinished

TRB.  *Id.* at __, 884 F. Supp. 2d. at 1324.  The uncontested facts are that the TRBs at issue

entered the United States as finished bearings that were processed, assembled, and exported by a

CPZ affiliate in Thailand.  As Commerce stated in the Remand Redetermination, the CPZ

affiliate in Thailand performed machining processes on the cups and cones through "a series of

steps wherein the width, the outside diameter, and bore of the rings (cup and cone) are ground

and the inside diameter of the outer ring and the outside diameter of the inner ring are polished."

*Remand Redetermination* 14 (footnote omitted).  The ground cups and cones "are then sent

through a further series of machining processes that demagnetize the rings and then assemble

them into finished TRBs with the inclusion of the PRC-finished cages and rollers (which are

themselves demagnetized and laser-etched with logos and product codes as part of the assembly

process)."  *Id.* at 14-15.

<u>3.  In Enacting 19 U.S.C. § 1677j(b), Congress Implicitly Recognized Limits on the
Department's Authority to Place within an Order Merchandise Assembled in a Third Country</u>

Section 781 of the Tariff Act, 19 U.S.C. § 1677j, "Prevention of circumvention of

antidumping and countervailing duty orders," was added to the antidumping statute by the

Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 102 Stat. 1107, 1192.

The Conference Report for this legislation specifies that the antidumping and countervailing duty

law prior to enactment of section 781 contained no specific provisions to address the problem of

circumvention of antidumping and countervailing duty orders.  H.R. Rep. No. 100-576,

at 599-600 (1988) (Conf. Rep.), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1632-33.  With respect to

subsection (b), which was similar to the current subsection (b), the Conference Report described

pre-enactment law as follows:

> No specific provision.  Under certain circumstances, Commerce considers merchandise completed or assembled in a third country to be subject to an anti-dumping or countervailing duty order or finding.

*Id.*  According to the Conference Report, both the House bill and a Senate amendment contained

a provision addressing goods assembled in third countries, the two versions were similar, and the

House acceded to the Senate amendment.  *Id*.  The Conference Report further explains that by

means of the Senate amendment "it is made explicit that the provision applies both in cases

where the order is on the merchandise shipped to the third country for completion or assembly

(diversion) and where the order is on a final product, parts or components of which are sent from

the country subject to the order to the third country for assembly or completion

(circumvention)."  H.R. Rep. No. 100-576, at 600, *reprinted in* 1988 U.S.C.C.A.N. at 1633.

The Conference Report did not describe the "certain circumstances" in which Commerce,

under the law as it existed at the time, would consider merchandise completed or assembled in a

third country to be within the scope of an order.  Nevertheless, both the House bill and the Senate

amendment included restrictions on the Department's authority to invoke the anticircumvention

provision directed to third country assembly or finishing operations.  It is apparent from

enactment of 19 U.S.C. § 1677j(b), as well as from the legislative history, that Congress

considered it necessary to provide Commerce authority to apply an order to merchandise

completed or assembled in a third country but also deemed it appropriate to place restrictions on

that authority.  In the version of § 1677j(b) enacted in 1988, those restrictions were that the

difference between the value of the merchandise on which the third country processing occurred

and the merchandise imported into the United States be small, § 1677j(b)(1)(C), and that

Commerce specifically determine that applying the order to the third country merchandise is

appropriate to prevent evasion of the order, § 1677j(b)(1)(D) (1988) (amended 1994).  In

addition, before taking such action, Commerce was to take into account whether the foreign

manufacturers are related, the pattern of trade, and whether imports of the merchandise from the

third country increased after issuance of the order.  *Id.* § 1677j(b)(1) (1988).

In amending the antidumping and countervailing duty laws, the Uruguay Round

Agreements Implementation Act of 1994 established § 1677j(b) in its current form.  *See* Uruguay

Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994).  According to the

legislative history accompanying the Uruguay Round Agreements Act, the anticircumvention

provisions enacted in 1988, being "based on the experience Commerce had had with

circumvention up to that time," were in need of revision because "Commerce subsequently

encountered new circumvention scenarios that revealed serious shortcomings in the 1988 Act."

H.R. Rep. No. 103-826, pt. 1, at 102 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3773, 3874

("House Report 826").  Regarding § 1677j(b), Congress specifically identified as in need of

revision the "requirement that the difference between the value of the parts imported into the

United States (or into a third country) from the country subject to the order and the value of the

finished product be 'small.'"  *Id.*  According to House Report 826, "[t]his mechanical,

quantitative approach fails to address adequately circumvention scenarios in which only minor

assembly is done in the United States (or in a third country), but for various reasons the

difference in value is not 'small.'"  *Id.*

Under § 1677j(b) as amended in 1994, the "mechanical, quantitative" approach was replaced by one in which Commerce could consider applying an order to merchandise completed or assembled in a third country where "the process of assembly or completion in the foreign country . . . is minor or insignificant," § 1677j(b)(1)(C), and "the value of the merchandise produced in the foreign country to which the antidumping duty order applies is a significant portion of the total value of the merchandise exported to the United States," § 1677j(b)(1)(D). The 1994 amendment inserted a new provision, now codified as § 1677j(b)(2), requiring Commerce to take into account five factors in determining whether the process of assembly or completion in the third country is "minor or insignificant": "(A) the level of investment in the foreign country, (B) the level of research and development in the foreign country, (C) the nature of the production process in the foreign country, (D) the extent of production facilities in the foreign country, and (E) whether the value of the processing performed in the foreign country represents a small proportion of the value of the merchandise imported into the United States." *Id.* § 1677j(b)(2).

The legislative histories of the 1988 and 1994 versions of § 1677j(b) do not state explicitly that Congress intended by enacting these provisions to limit the authority of Commerce in construing the scope of an existing order in any situation in which third country completion or assembly is at issue. Nevertheless, both versions of § 1677j(b) and the accompanying legislative histories make clear that Congress considered it necessary to grant Commerce additional authority so that Commerce could address these situations by expanding, rather than merely interpreting, the scope of an existing antidumping or countervailing duty order. Congress could not have done so without possessing a general understanding that a good emerging from a third country completion or assembly operation such as that described in

19 U.S.C. § 1677j(b)(1)(A) and (B) ordinarily would not be considered to be within the scope of

the order in question, at least where, as here, the commercial identity of the finished good was

acquired in the third country.[9]  Absent such an understanding, it is doubtful that Congress would

have considered it necessary to provide Commerce the authority that it did in enacting

§ 1677j(b), for the Department's existing authority to interpret an antidumping duty order would

have been seen to suffice.  It therefore can be inferred from the legislative purpose underlying

§ 1677j(b) that Congress took a narrower view of the Department's authority to interpret,

without expanding, the scope of an antidumping duty order than Commerce has taken in this

case.

        Moreover, Congress did not consider it appropriate to allow Commerce to expand the

scope of an antidumping duty order pursuant to § 1677j(b) without placing on that authority the

restrictions that are set forth in § 1677j(b)(1)(C)-(E).  Those restrictions would be rendered

ineffective in this case were Commerce free to avoid them by the simple expedient of ruling that

the order at issue already includes a TRB that not only was assembled, but also machined, in a

third country from individual parts, none of which was an unfinished TRB.

        The court concludes that the way in which Congress provided anticircumvention

authority in 19 U.S.C. § 1677j(b) is an indication that Commerce exceeded the limitations on its

authority to interpret, without enlarging, the scope of the Order when it placed within that scope

---

        [9] In this regard, the Remand Redetermination does not dispute the contention of
PBCD, LLC ("PBCD") that the TRBs at issue would be considered by U.S. Customs and Border
Protection ("CBP") to be products of Thailand, not China, for general tariff purposes (for
example, tariff treatment and country-of-origin marking purposes). *Remand
Redetermination* 45-46 ("With respect to PBCD's complaint that our country-of-origin
determination is not consistent with CBP rulings, we again note that, although the Department
may consider country-of-origin determinations made by other agencies of the U.S. government,
we are not bound by such rulings.").

the TRBs exported from Thailand.  Here, Commerce placed within the Order a product of a type

Congress contemplated would be the subject of an anticircumvention inquiry, without actually

conducting such an inquiry.

<u>4.  The Record Evidence, and the Department's Own Findings, Might Have Precluded
Commerce from Lawfully Expanding the Scope of the Order by Resort to 19 U.S.C. § 1677j(b)
Had Commerce Invoked Its Authority under that Provision</u>

Had Commerce chosen to conduct an anticircumvention inquiry under 19 U.S.C.

§ 1677j(b), it could not have placed the TRBs in question within the order without meeting all

three of the criteria Congress set forth in § 1677j(b)(1)(C)-(E).  The criterion in paragraph (C) is

that "the process of assembly or completion in the foreign country . . . is *minor* or *insignificant*."

19 U.S.C. § 1677j(b)(1)(C) (emphasis added).  On the record of the twenty-second review, it is

far from certain that this criterion could have been met.[10]

One obstacle to satisfying the paragraph (C) criterion is that the "process of assembly or

completion" conducted in Thailand was more than mere assembly or completion.  As Commerce

itself found, the cup and cone machining process in Thailand involved "a series of steps wherein

the width, the outside diameter, and bore of the rings (cup and cone) are ground and the inside

diameter of the outer ring and the outside diameter of the inner ring are polished."  *Remand*

*Redetermination* 14 (footnote omitted).  Commerce further found that "[t]he ground cups and

cones are then sent through a further series of machining processes that demagnetize the rings

and then assemble them into finished TRBs with the inclusion of the PRC-finished cages and

rollers (which are themselves demagnetized and laser-etched with logos and product codes as

part of the assembly process)."  *Id.* at 14-15.  The machining processes extend beyond

---

[10] Had Commerce attempted to reach such a finding, it would have been required in doing
so to consider the factors of 19 U.S.C. § 1677j(b)(2) ("Determination of whether process is
minor or insignificant") and (3) ("Factors to consider").  As the court discussed previously in this
Opinion and Order, Commerce conducted no inquiry under § 1677j(b).

"assembly," and because they are critical intermediate processes conducted on the two major

parts of a TRB, they cannot correctly be described as mere "finishing" operations.

        Other Commerce findings further indicate that satisfying the § 1677j(b)(1)(C) criterion

might have been difficult.  Although Commerce found in the Remand Redetermination that "the

processes in the PRC, involving forging, annealing, turning, grinding green-machining, and heat

treating, impart the essential character to the TRB," *Remand Redetermination* 20, this finding is

qualified by others of the Department's findings that bear directly on the § 1677j(b)(1)(C)

inquiry.[11]  Commerce considered the grinding and finishing processes conducted on the cups and

cones in Thailand to be "minor" compared to the manufacturing steps conducted in China, *id.*

at 17, but in that same context it stated a finding as follows: "[w]e acknowledge, however, that

this small change to the shape and surface of the cups and cones (and assembly thereof) is a

*critical step* in imparting the very specific physical properties of each TRB that allow for the

product to function as a TRB," *id.* (emphasis added).  Commerce further found that the cup and

cone grinding and finishing processes conducted in Thailand "along with the assembly process

that allows for the bearing to be sold as a functional final product, certainly plays [an] *important*

*role in the production of a bearing.*"  *Id.* at 18 (emphasis added).  There is no doubt that the

record evidence supported the latter two findings, as the cups and cones were not functional

components upon exportation from China, and "bearings," finished or unfinished, did not exist

---

        [11] This "essential character" finding is open to question in that the cups and cones left
China in an unfinished state and that only after the further machining of the cups and cones in
Thailand occurred, and the assembly operations occurred, did actual bearings exist that could be
said even to have possessed an "essential character."  Moreover, the cups and cones were not
functional as cups and cones in the unfinished state in which these two major components left
China.  But even were the court to accept the Department's "essential character" finding as
supported by substantial evidence, the court still could not overlook the significance for the
19 U.S.C. § 1677j(b)(1)(C) criterion of the other findings Commerce made.

prior to the Thai assembly process.  Commerce also found that the "grinding and assembly

process" is "substantial," saying of the grinding process that "[f]ar from applying a 'simple'

surface polish or thread, the grinding process utilizes technically sophisticated machinery to

finish various surfaces of different components to precise technical specifications." *Remand

Redetermination* 26.  Commerce did not consider the assembly process in Thailand to be

"technically sophisticated," *id.* at 15, but also found that this process "requires a combination of

machinery and manpower atypical of a 'simple' assembly process," *id.* at 26.  It is difficult to

reconcile various of the Department's findings with a potential finding under § 1677j(b)(1)(C)

that the "process of assembly or completion" conducted in Thailand (which plainly was more

than that) was "minor or insignificant."  Nevertheless, the record contained other evidence that

would lend support to such a finding; in particular, the record included the evidence from which

Commerce calculated the aforementioned weighted-average per-unit cost of production ("COP")

ratios.  As the court discussed previously, Commerce derived the ratios by dividing the reported

manufacturing labor and overhead costs incurred in Thailand by the sum of those costs and the

COP incurred in China (albeit determined according to surrogate values), which included

materials costs as well as manufacturing labor and overhead.

       To reach an affirmative finding under § 1677j(b), Commerce also would have been

required to find, according to paragraph (D) of § 1677j(b)(1), that the value added in China "is a

significant portion of the total value of the merchandise exported to the United States."

19 U.S.C. § 1677j(b)(1)(D).  The record evidence from which Commerce calculated the COP

ratios demonstrates that this criterion would be met.  *Remand Redetermination* 20-26.  The same

cannot be said with certainty regarding the statutory criterion that follows in paragraph (E),

which is that Commerce determine "that action is appropriate under this paragraph to prevent

evasion of such order . . . .”  19 U.S.C. § 1677j(b)(1)(E).  The Remand Redetermination states

that “[i]n the underlying proceeding, as in the prior review, Petitioner did not raise particular

concerns with respect to circumvention potential and we similarly did not find that the

circumstances warranted the initiation of a separate circumvention inquiry (believing our

substantial transformation analysis sufficient to determine country of origin).”  *Remand

Redetermination* 33.  If the circumstances do *not* warrant an anticircumvention inquiry under

§ 1677j(b), the criterion in § 1677j(b)(1)(E) could not be satisfied.

Some of the factors Commerce is required by 19 U.S.C. § 1677j(b)(2) to consider would

raise further questions.  Congress directed Commerce, in § 1677j(b)(2)(A), to consider “the level

of investment in the foreign country.”  *Id.*  The Remand Redetermination found that “the level of

investment in Thailand is not significant when compared to the level of investment in the PRC”

but conceded that “we do not have the actual values for the level of investment,” insisting that

“we are able to reach this conclusion based on a reasoned analysis focusing on the types of

production equipment utilized for the grinding and assembly stages of production in Thailand in

comparison to the types of production equipment utilized for the production stages taking place

in the PRC.”  *Remand Redetermination* 32.  Although the record contains qualitative (but not

quantitative) evidence supporting a finding that the investment in China was more significant

than that in Thailand, it also contains evidence, cited in the Remand Redetermination, that the

machining, etching, and assembly processes performed in Thailand involved different types of

machinery and multiple stages.  *See id.* at 15, 31-32.  That the processes performed in Thailand

extended beyond the mere “assembly or finishing” that the statute identifies in § 1677j(b)(1)(C)

is also significant for the criterion in § 1677j(b)(2)(C), under which Commerce must consider

“the nature of the production process in the foreign country,” § 1677j(b)(2)(C).  In that regard,

Commerce found, as the court mentioned above, that the machining conducted in Thailand was a

"critical step," *Remand Redetermination* 17, and that the processes performed in Thailand

"play[ed] [an] important role in the production of a bearing," *id.* at 18.

> 5.  Commerce Exceeded Its Authority to Interpret the Scope Language when it Placed under the
> Order the TRBs Resulting from Operations Conducted in Thailand

   For the reasons the court discussed previously, the court must conclude that the issue

posed by the TRBs emerging from the Thai processing was of a type Congress intended would

be addressed under § 1677j(b) in the context of a possible enlargement of the scope of the Order.

The court is not ruling that Commerce *could not* have satisfied the requirements Congress

imposed in § 1677j(b) for expansion of the Order, for the court need not resolve this issue in

ruling on PBCD's claim.  It is sufficient to conclude, instead, that the result of any inquiry

Commerce could have conducted under § 1677j(b) would have been far from certain.  On this

administrative record, the court cannot at the same time conclude that Commerce had the

discretion to place these TRBs under the Order by relying solely on its interpretive authority,

which necessarily is narrower than the anticircumvention authority provided by § 1677j(b).  *See*

*Duferco*, 296 F.3d at 1098.

   The record evidence, considered as a whole, does not support a finding that the relevant

scope language of the Order, "imports of tapered roller bearings from the PRC," when

interpreted so as not to expand the Order, describes the finished TRBs that were exported to the

United States from Thailand.  As the court emphasized in the foregoing discussion, the

uncontested record facts demonstrate that no part exported to Thailand from China was an

unfinished or incomplete TRB, and Commerce did not reach a factual finding to the contrary.

There can be no dispute over the fact that the goods at issue became tapered roller bearings in

Thailand, not China.  While it is apparent from the record evidence that the question posed by

this case was of a type Congress intended Commerce to address under paragraphs (A) and (B) of

§ 1677j(b)(1), the same record evidence demonstrates that the processing in Thailand extended

beyond a process of "assembly or completion," the term the statute applies in paragraph (C) of

§ 1677j(b)(1).  The processing included, prior to any assembly operations, the grinding and

honing of cups and cones that, upon exportation from China, were not functional cups and cones

ready for assembly.  Because no unfinished or incomplete bearings were exported to Thailand,

the Thai operations cannot fairly be characterized as merely a "completion" process.  As the

court also discussed above, Commerce may have found itself unable to satisfy all the criteria of

§ 1677j(b) yet still insisted that, according to its "totality of the circumstances" method, it could

place the TRBs within the Order by relying solely on its interpretive authority, i.e., without

attempting to augment that authority by conducting an inquiry under § 1677j(b).  Doing so

avoided the issues that would have resulted from the restrictions Congress placed on the

Department's authority to expand the scope of the Order and, on the record evidence of this case,

would render those restrictions meaningless.  Commerce construed its authority to interpret,

without expanding, the scope of the Order to be broader than it actually is.

     Commerce reasoned that it "did not find that the circumstances warranted the initiation of

a separate circumvention inquiry (believing our substantial transformation analysis sufficient to

determine country of origin)."  *Remand Redetermination* 33.  As Commerce explained in the

Issues and Decision Memorandum for the Final Results, the "substantial transformation analysis"

Commerce used is an adaptation of the "established" criteria Commerce uses generally in

making country-of-origin determinations.  Issues & Decision Mem., A-570-601, at 11-12

(Jan. 11, 2011) (Admin.R.Doc. No. 6041), *available at*

http://enforcement.trade.gov/frn/summary/PRC/2011-1026-1.pdf (last visited June 4, 2014)

("*Decision Mem.*").  Commerce may be called on in other cases to decide, for example, whether

a product processed in the country named in an antidumping duty order using materials and

components from a third country should be treated as subject merchandise.  Here, Commerce

used a "one-size-fits-all" approach when the issue called for an analysis directed to the question

posed by this case, which involved merchandise that became TRBs only after machining and

assembly processes conducted in a third country.  As the enactment of 19 U.S.C. § 1677j(b) and

the associated legislative history indicate, such merchandise, absent expansion of an order using

the authority of § 1677j(b), ordinarily would be considered to be products of the third country.

And as the court instructed in *Peer Bearing-Changshan*, "[a]ny determination Commerce

reaches on remand must rely solely on criteria relevant to whether the parts exported to Thailand

were substantially transformed and must be based on findings supported by substantial record

evidence."  *Id.* at __, 884 F. Supp. 2d. at 1325.

 In summary, the method and criteria applied in the Remand Redetermination caused

Commerce to ignore critical record evidence, as the court has described.  Considered on the

whole, the record lacked substantial evidence to support the ultimate finding Commerce reached

in the Remand Redetermination.  The court concludes that Commerce, when placing the TRBs in

question within the scope of the Order, exceeded its authority to interpret, without expanding, the

scope language contained in that Order.

 D.  The Court Sustains the Redetermined Surrogate Value for CPZ's Bearing-Quality Steel Bar

 In determining the normal value of subject merchandise from a nonmarket economy

country such as China, Commerce, under section 773(c)(1) of the Tariff Act, ordinarily values

"the factors of production utilized in producing the merchandise."  19 U.S.C. § 1677b(c)(1).  The

statute requires generally that Commerce value factors of production "based on the best available

information regarding the values of such factors in a market economy country or countries" that

Commerce considers appropriate.  *Id.*  The statute provides that Commerce, in valuing factors of

production, "shall utilize, to the extent possible, the prices or costs of factors of production in

one or more market economy countries that are . . . at a level of economic development

comparable to that of the nonmarket economy country, and . . . significant producers of

comparable merchandise."  19 U.S.C. § 1677b(c)(4).

In the Remand Redetermination, Commerce used record price data pertaining to SKF's

actual market economy purchases of bearing-quality steel to value the steel input for the

SKF-produced bearings sold by SKF's affiliate during the POR.  *Remand Redetermination* 65.

To value the bearing-quality steel input in the subject merchandise produced by CPZ, including

CPZ-produced merchandise sold by an SKF-related entity after the acquisition, Commerce used

a "surrogate" value, i.e., a value derived from data pertaining to a market economy country (in

this instance, Thailand) that Commerce considered economically comparable to China.  *Id.* at 39.

In the Final Results, Commerce determined the surrogate value using publicly-available

information on the average unit value ("AUV") of imports in India made during the POR, as

reported by Global Trade Atlas ("GTA").  *Remand Redetermination* 7 & n.28.  From the GTA

import data pertaining to Indian Harmonized Tariff Schedule ("HTS") subheading 7228.30.29,[12]

Commerce calculated an AUV of approximately $1.956 per kilogram.[13]  *Analysis of the Final*

*Results Margin Calculation for Peer Bearing Company-Changshan* 4 n.7, Attach. 1

---

[12] Commerce describes this tariff subheading as applicable to "Other Bars And Rods Of
Other Alloy Steel (Not Elsewhere Specified or Indicated); Angles, Shapes And Sections Of
Other Alloy Steel; Hollow Drill Bars And Rods Of Alloy Or Nonalloy Steel {7228}; Other bars
and rods, not further worked than hot-rolled, hot-drawn or extruded; Bright bars {.30}; Other
{.29}."  *Remand Redetermination* 7 n.28.

[13] The actual surrogate value varied slightly from this amount because Commerce
combined the public import data with proprietary data pertaining to certain market economy
purchases of steel bar by CPZ.  *Analysis of the Final Results Margin Calculation for Peer
Bearing Company-Changshan* 4, Attach. 1 (Jan. 11, 2011) (Admin.R.Doc. No. 6039).

(Jan. 11, 2011) (Admin.R.Doc. No. 6039) (“*PBCD Final Results Analysis Mem.*”).  Because the

Indian subheading is not specific to bearing-quality steel goods, Commerce used only the GTA

import data thereunder that pertained to Indian imports from the United States, Japan, and

Singapore, determining from record evidence that the other countries of origin shown in the

Indian GTA data “could not be shown definitively to have exported bearing quality steel to India

during the POR.”  *Decision Mem.* 34 (footnote omitted); *see also PBCD Final Results Analysis

Mem.* 4.  That record evidence consisted of Indian import data compiled by Infodrive India

(“Infodrive”), which CPZ had placed on the administrative record during the review.[14]  *Decision

Mem.* at 33-34.

        In its previous opinion, the court held that record evidence did not support a finding that

the subset of Indian import data of HTS subheading 7228.30.29, a “basket” category not specific

to bearing-quality steel, represented the best available information to value the steel bar inputs.

*Peer Bearing-Changshan*, 36 CIT at __, 884 F. Supp. 2d at 1332.  The court noted that these

data, even when limited to data pertaining to countries shown by Infodrive India to have

exported bearing-quality steel to India, still included “substantial quantities of

non-bearing-quality steel goods within the dataset.”  *Id.*  The court directed Commerce to

reconsider its surrogate value, consider available alternatives, including the use of the Infodrive

data, and reach a surrogate value shown by substantial evidence to be based on the best available

information.  *Id.* at __, 884 F. Supp. 2d at 1333, 1339.  In the Remand Redetermination,

Commerce decided that certain GTA import data pertaining to Thailand, specifically, data for

Thai HTS subheading 7228.30.90, were the best information on the record with which to value

---

[14] Infodrive India (“Infodrive”) is a private entity that compiles data from commercial documentation.  *See Remand Redetermination* 37.

the steel bar input.  *See Remand Redetermination* 39.  These data showed an AUV of $1.43 per

kilogram.  *Id.* at 38.  Commerce also considered the record Infodrive data that is specific to

bearing-quality steel imports in India, which showed an AUV of $1.60 per kilogram.  *Id.*

at 37-38.  Commerce decided against using the Infodrive data as a surrogate value but found

these data suitable for use as a benchmark to show that the Indian import data may be

aberrational when used to value bearing-quality steel.  *Id.* at 37.

        PBCD commented in favor of the revised surrogate value.  PBCD's Comments 3.  SKF

objected on the ground that Commerce, when determining the normal value of all merchandise

SKF sold during the POR, including the subject merchandise produced by CPZ, should have

valued the steel bar input according to the price data in SKF's market economy purchases of

bearing-quality steel bar.  SKF's Comments 12-16.  SKF argues that using the market prices

exclusively would be consistent with the Department's policy and practice, that SKF

"demonstrated that it could obtain a substantial portion of its steel bar inputs at a given market

economy price during the POR," and that, "[t]herefore, the Department should apply this market

economy price to all the products SKF sold during the POR, even those products for which the

market economy price may not be representative, such as the products acquired from PBCD's

inventory."  *Id.* at 14.

        SKF adds that, as a matter of fairness, it should not be penalized because of the past

purchasing of another party (i.e., CPZ), which is a matter over which it had no control.  *Id.*

Referring to the Department's policy of using market economy purchase data when market

economy purchases are 33% or more of a respondent's total purchases of an input, SKF argues

that "[i]n the present case, SKF could not control how much market economy steel [CPZ]

purchased before the acquisition" and that "[a]ll SKF could do was ensure that it purchased more

than 33 percent of its steel from market economy sources after the acquisition." *Id.*  According

to SKF, "[i]t would be fundamentally unfair to penalize SKF for [CPZ]'s failure to purchase

more steel from market economy sources, particularly when [CPZ] produced merchandise for

only three months of the period of review." *Id*.  SKF adds that "the Department has not

explained why it is reasonable to apply a respondent's current market economy price to products

from a respondent's inventory that it produced in the past but not to apply a respondent's current

market economy price to products sold by the respondent that were acquired from the inventory

of another company that has ceased to exist." *Id*. at 16.

　　A regulation of the Department provides that "[t]he Secretary normally will use publicly

available information to value factors [of production]."  19 C.F.R. § 351.408(c)(1).  In a second

sentence, the regulation includes an exception to the general preference for the use of publicly

available information in valuing factors of production of nonmarket economy ("NME")

producers, providing that "[h]owever, where a factor is purchased from a market economy

supplier and paid for in a market economy currency, the Secretary normally will use the price

paid to the market economy supplier." *Id*.  The Department's use of SKF's market economy

purchase prices in valuing all steel bar input SKF used in producing subject merchandise sold

during the POR, as described in the Remand Redetermination, appears to have conformed to the

practice identified in the second sentence.  The regulation contains a third, concluding sentence

that reads as follows: "In those instances where a portion of the factor is purchased from a

market economy supplier and the remainder from a nonmarket economy supplier, the Secretary

normally will value the factor using the price paid to the market economy supplier." *Id*.

　　A threshold question presented is whether the third sentence applies to the issue

presented here such that Commerce, if following its "normal" practice, should have valued

CPZ's use of the steel bar input according to SKF's market economy purchases where SKF made

the sale.  On its face, the regulation can be read to apply to a situation in which a respondent

NME producer has U.S. sales of merchandise within a period of review that were manufactured

by another NME producer.  A contrary reading would hold that the term "factor," i.e., "factor of

production," should be read to be unique to a single producer and that, therefore, the third

sentence in the regulation does not address the issue posed by this case.  Commerce gave

indications of intending the latter when it promulgated § 351.408(c)(1).  In the preamble

accompanying promulgation of the regulation ("Preamble"), Commerce explained that it did not

intend to apply the "normal" method described in the third sentence of the regulation unless the

amounts purchased from a market economy supplier were "meaningful."  *See Antidumping

Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,366 (May 19, 1997) ("*Preamble*").  The

Preamble also suggested, without clearly stating, that Commerce intended to apply the method

described in the third sentence only if the NME producer itself made the significant-quantity

market economy purchases.  *Id.* ("Moreover, as noted in the AD Proposed Regulations, 61 FR

at 7345, we would not rely on the price paid *by an NME producer* to a market economy supplier

if the quantity of the input purchased was insignificant.") (emphasis added).  Referring to a

comment it had received on the proposed version of the regulation, the Preamble adds that

"[b]ecause the amounts purchased from the market economy supplier must be meaningful, this

requirement goes some way in addressing the commenter's concern that *the NME producer* may

not be able to fulfill all its needs at that price."  *Id.* (emphasis added).

In a Federal Register notice issued in 2006 (the "Methodologies Notice"), Commerce

established "clearer guidance as to the circumstances in which it will accept market economy

purchase prices to value an entire input" and in so doing explained how it normally would decide

whether amounts purchased from a market economy supplier are "meaningful." *Antidumping*

*Methodologies: Market Economy Inputs, Expected Non-Market Economy Wages, Duty*

*Drawback; and Request for Comments*, 71 Fed. Reg. 61,716, 61,717 (Oct. 19, 2006)

("*Methodologies Notice*").  Commerce stated in the Methodologies Notice that "[t]he

Department is now instituting a rebuttable presumption that market economy input prices are the

best available information for valuing an entire input when the total volume of the input

purchased from all market economy sources during the period of investigation or review exceeds

33 percent of the total volume of the input purchased from all sources during the period." *Id.*,

71 Fed. Reg. at 61,717-18.  This formulation of the rebuttable presumption can be read to mean

that Commerce will apply its 33% test to the total amount of an input purchased during a POR

even in a situation in which two producers were involved.  Nevertheless, the Methodologies

Notice, like the Preamble, suggests that the discussion refers to a context involving a single

producer that purchases a factor of production.  *See id.*, 71 Fed. Reg. at 61,718 ("In determining

whether market economy purchases meet this 33 percent threshold, the Department will compare

the volume that the producer purchased from market economy sources during the period of

investigation or review with the respondent's total purchases during the period.").  In view of the

guidance provided by the Preamble (which is consistent with some of the guidance provided in

the Methodologies Notice), the court concludes that Commerce interprets the third sentence of

§ 351.408(c)(1) to apply in the context of a single producer.  The court defers to this

interpretation.

The court does not hold or imply that Commerce would have lacked authority under

§ 351.408(c)(1), which describes the Department's "normal" method, to use SKF's market

economy purchase data as a surrogate for the valuation of CPZ's steel bar input in the SKF sales

on the record facts of this case, had Commerce chosen to do so.[15]  Rather, the court concludes

that such a course of action would have been a departure from the Department's "normal"

method as set forth in the regulation as interpreted by Commerce itself.

The Remand Redetermination justifies the Department's decision to value the steel bar

input in the merchandise sold by SKF, but produced by CPZ, according to the Thai import

surrogate value rather than SKF's market economy purchase data, on the ground that it is

consistent with the Department's practice to do so.  *Remand Redetermination* 63-64.  SKF

impliedly disagrees, but the Department's own construction of § 351.408(c)(1), discussed above,

convinces the court that Commerce followed its normal practice in this case, both in using SKF's

market economy purchases to value the steel bar input in all subject merchandise produced by

SKF and in using the surrogate value for the steel bar input in the CPZ-produced merchandise

that SKF sold.  SKF does not make a convincing argument that the Department should make an

exception to its normal practice.  SKF's argument that the Remand Redetermination did not

provide a reasonable explanation for the Department's decision is a more convincing argument,

for the Remand Redetermination does not offer a rationale beyond that of achieving consistency

with the Department's practice.  The reasoning underlying the decision would have been

clarified and augmented had Commerce also indicated why it might consider the

---

[15] Nor would the statute bar such an approach.  Commerce is directed to value factors of production according to the "best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority."  19 U.S.C. § 1677b(c)(1).  The statute provides that Commerce, in valuing factors of production, "shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are . . . at a level of economic development comparable to that of the nonmarket economy country, and . . . significant producers of comparable merchandise," *id*. § 1677b(c)(4), but Commerce, in selecting the best available information with which to determine a surrogate value, is not necessarily precluded from using market economy purchase data even if those data do not pertain to a country satisfying the criteria of § 1677b(c)(4).

Thai-import-based surrogate value to be the best available record information, and to result in a

more accurate margin, when viewed in comparison to the price data pertaining to SKF's market

economy purchases.

Nevertheless, the court declines to remand the matter for additional explanation.  The

rationale in the Remand Redetermination that Commerce followed its practice is properly viewed

in the context of the reasoning supporting the practice that is set forth in the Preamble.  In

limiting its normal use of market economy purchase data in the way that it did in adopting the

practice, Commerce balanced competing considerations.  Commerce expressly recognized that

market economy purchase data would not be publicly available information, for which a

preference is expressed in the first sentence of § 351.408(c)(1).  *Preamble*, 62 Fed. Reg.

at 27,366.  Commerce recognized a general interest in the accuracy furthered by the use of

market economy purchase data, but in doing so Commerce also placed significance on the

question of whether an NME producer would be able to fulfill all its needs at the market

economy price.  *Id*.  Nothing in the subsequent Methodologies Notice is inconsistent with the

balancing of these competing considerations that Commerce undertook in the Preamble.  Owing

a degree of deference to the methodological choice Commerce made in adopting its practice, and

considering the rationale for that choice as explained in both the Preamble and the

Methodologies Notice, the court must affirm the Department's decision to use the Thai import

surrogate data rather than SKF's market economy purchases when valuing the steel bar input in

merchandise sold by SKF but produced by CPZ.

E.  The Court Orders a Second Remand on the Department's Choice of Factor-of-Production
    Data Used to Determine the Normal Value of the Pre-Acquisition Inventory Sold by SKF

In contesting the Final Results, Timken claimed that Commerce erred in using SKF's

factor-of-production data in determining the normal value of the pre-acquisition inventory sold

by SKF and thereby "contravened the statutory requirements of l677b(c)(1)" because these data

did not correspond to the actual producer of the merchandise in question.[16]  Timken Co.'s Mem.

of P. & A. in Supp. of its Mot. for J. on the Agency R. 23 (Aug. 19, 2011), ECF No. 36.  In *Peer*

*Bearing-Changshan*, the court ordered Commerce to "reconsider its decision to value

pre-acquisition-produced subject merchandise using factors of production pertaining to the

post-acquisition producer" and redetermine normal value in accordance with § 1677b(c)(1).  *Id.*

at __, 884 F. Supp. 2d at 1339-40.

       The administrative record of the twenty-second administrative review contained three

sets of FOP data concerning the pre-acquisition inventory of TRBs.  SKF submitted FOP data

based on its production of subject merchandise following the acquisition, i.e., data relating to

SKF's production of subject merchandise from September 12, 2008 through May 31, 2009.[17]

*SKF Section C & D Response*, Exs. D-l to D-4, D-42 (Nov. 12, 2009) (Admin.R.Doc. No. 5663);

*Joint SKF & PBCD Section C & D Supplemental Resp.* 11-12, Ex. SD-4 (May 28, 2010)

---

[16] In reply, defendant argued that the claim brought by the Timken Company ("Timken")
was barred by the exhaustion doctrine.  *Peer Bearing-Changshan*, 36 CIT at __, 884 F. Supp. 2d
at 1338.  The court subsequently held that, although Timken failed to raise the issue before
Commerce and thus failed to exhaust its administrative remedies, the "pure legal question"
exception to exhaustion applied.  *Id.*  The court noted that the instant factors of production issue
"presents no question of fact" because Commerce had determined "that SKF was not the
successor in interest to CPZ," and subsequently "treated the companies as separate respondents
in the review."  *Id.* (citing *Final Results*, 76 Fed. Reg. at 3,087).  The court, therefore, concluded
that "[t]he only question to be resolved is whether, on these uncontested facts, Commerce acted
inconsistently with 19 U.S.C. § 1677b(c)(1) in using the FOP data it obtained from SKF to value
subject merchandise produced by CPZ."  *Id.*

[17] SKF refers to its initial factor-of-production data submission as the "FOPPER2"
database.  *Letter from Herbert C. Shelley to the Sec'y (SKF Section C & D Resp.)* 2
(Nov. 12, 2009) (Admin.R.Doc. No. 5663).  SKF refers to its supplemental factor-of-production
data submission as the "FOPPER2SUP" database.  *Joint SKF & PBCD Section C & D
Supplemental Resp.* 11-12 (May 28, 2010) (Admin.R.Doc. No. 5761) ("*Joint Sec. C & D
Supplemental Resp.*").

(Admin.R.Doc. No. 5761).  PBCD submitted FOP data concerning the TRBs produced by CPZ

during the first three months of the POR, i.e., June 1, 2008 through August 31, 2008.[18]  *PBCD*

*Section D Resp.* 1, 5, Ex. 1 (Nov. 13, 2009) (Admin.R.Doc. No. 5672).  Finally, petitioner

Timken submitted data on CPZ's factors of production that pertained to the prior (twenty-first)

administrative review period, i.e., June 1, 2007 through May 31, 2008.  *Factual Submission of*

*the Timken Co.* 1, Ex. 3 (Nov. 17, 2009) (Admin.Rec.Doc. No. 5677).

 In the Remand Redetermination, Commerce recalculated the normal value ("NV") of

SKF's sales of pre-acquisition inventory using factor-of-production data submitted by PBCD for

merchandise that CPZ produced during the first three months of the POR.  *Remand*

*Redetermination* 39.  In explaining its decision to deviate from the course it chose in the Final

Results, Commerce stated that while it "prefers to calculate NV based on the FOP data

corresponding to production of subject merchandise during the POR, and not the FOP data

corresponding to the production of the merchandise actually sold during the POR," *id.*, it also

prefers to "calculate NV using the FOPs of the actual producer(s) of the merchandise," *id.* at 40.

Based on this rationale, Commerce concluded that the FOP data submitted by PBCD yielded the

"accurate normal value to use in the dumping calculation" because the data related to the

producer of the merchandise at issue.  *Id.* at 62.  Timken does not oppose the Department's

resolution of this issue; SKF, however, raises several objections.

 The statute directs Commerce to "determine the normal value of the subject merchandise

on the basis of the value of the factors of production *utilized in producing the*

---

[18] PBCD refers to its submitted factor-of-production data as the "PBCDFPOl" database.
*PBCD Section D Resp.* 1, 5, Ex. 1 (Nov. 13, 2009) (Admin.R.Doc. No. 5672).  In a subsequent
supplemental submission, PBCD explained that, due to its recordkeeping system, it was unable
to determine factors for the period of September 1, 2008 through September 11, 2008.  *Joint Sec.*
*C & D Supplemental Resp.* 11-12.

*merchandise . . . .*"[19]  19 U.S.C. § 1677b(c)(l) (emphasis added).  According to the plain meaning of this directive, the FOPs used by the Department should, as Commerce concluded upon remand, pertain to the actual party that produced the merchandise, but they also should correspond to the time period in which the merchandise was produced (which is not necessarily when the merchandise was sold).  The statute contemplates that FOP data meeting these two conditions ordinarily would be used to calculate normal value.  If no such data are on the record, or if there is a valid reason why the data on the record may not properly be used, Commerce would have resort to the "facts otherwise available" pursuant to authority conferred by 19 U.S.C. § 1677e(a).

In the Remand Redetermination, Commerce provided adequate reasoning for rejecting SKF's post-acquisition FOP data, which correspond with neither the correct producer nor the time period during which the merchandise was produced.  Commerce did not address the question of why it chose not to use the FOP data submitted by Timken.  On remand, Commerce must reconsider its selection of the data submitted by PBCD over the data submitted by Timken and provide a rationale grounded in the requirements of the statute for the data set it chooses.

---

[19] Section 1677b(c)(1) states, in pertinent part, as follows:

If—
    (A) the subject merchandise is exported from a nonmarket economy country, and
    (B) the administering authority finds that available information does not permit the
    normal value of the subject merchandise to be determined under subsection (a) of this
    section,
the administering authority shall determine the normal value of the subject merchandise *on the basis of the value of the factors of production utilized in producing the merchandise . . . .*
19 U.S.C. § 1677b(c)(1) (emphasis added).

SKF opposes the Department's FOP redetermination on several grounds.[20]  First, SKF

argues that its own FOP data yield a more accurate normal value calculation.  SKF's

Comments 6-8.  SKF raises several points in support of this argument, which it summarizes as

follows:

> Given that (1) such a large portion of the [CPZ-produced] products sold by SKF
> were not produced during the three month period corresponding to [CPZ's]
> FOPS; (2) SKF's average factor usage is likely to be very similar to [CPZ's]
> average factor usage; and (3) [CPZ's] FOPs are based on such a short period of
> time, one cannot reasonably conclude[] that [CPZ's] FOPs provide a more
> accurate basis for calculating normal value of the [CPZ]-produced products sold
> by SKF.

*Id.* at 8.  Second, SKF argues that, "[e]ven if there were evidence to suggest that [CPZ's] FOPs

more accurately represent the production of the [CPZ]-produced merchandise sold by

SKF, . . . the Department's use of these FOPs would still be arbitrary and capricious," because

Commerce deviated from its policy of using "the FOPs that correspond to a respondent's

production during the POR" without providing "a reasonable justification for doing so."  *Id.* at 9

(citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*

463 U.S. 29, 57 (1983)).  Finally, SKF adds that, as a matter of fairness, Commerce should not

use CPZ's factor-of-production data to value SKF's post-acquisition sales of CPZ-produced

---

[20] As a preliminary argument, SKF reasserts that Timken failed to exhaust its
administrative remedies on this issue and argues, further, that no "pure question of law"
exception applies.  Pls.' Comments on Final Results of Redetermination Pursuant to Remand 3-6
(June 12, 2013), ECF No. 103 ("SKF's Comments").  The court addressed this issue in *Peer
Bearing-Changshan*, 36 CIT at __, 884 F. Supp. 2d at 1338.  Because the issue before the court
in *Peer Bearing-Changshan* was one of statutory construction, the court believes it was correct
in ruling that Timken's failure to exhaust administrative remedies was excusable under the "pure
legal question" exception.  On remand, Commerce reached a new determination in response to
the court's order but did not do so under protest.  The Remand Redetermination raises a new
question that the court now must consider (which, incidentally, also involves the plain meaning
of the statute, 19 U.S.C. § 1677b(c)(1)).

merchandise as CPZ "had ceased to exist and SKF had no control over the production process and the associated costs." *Id.* at 10.

The court does not find SKF's arguments persuasive.  As discussed, *supra*, the statute instructs Commerce to "determine the normal value of the subject merchandise on the basis of the value of the factors of production *utilized in producing the merchandise*" when the subject merchandise is exported from an NME country.  19 U.S.C. § 1677b(c)(l) (emphasis added). SKF's factors of production could not possibly have been those actually utilized in producing the pre-acquisition merchandise, which was produced by CPZ.  In the Remand Redetermination, Commerce correctly disregarded SKF's factor-of-production data in determining the normal value of pre-acquisition merchandise.  The argument that CPZ had ceased to exist and that SKF therefore had no control over the production process and the associated costs is also unpersuasive.  The two aspects of FOP data stemming from the directive contained in § 1677b(c)(l), i.e., the identity of the producer and time of production, must take precedence over the concern raised by SKF.

### III. CONCLUSION AND ORDER

For the reasons discussed in the foregoing, the court affirms in part, and rejects in part, the Final Results of Redetermination Pursuant to Court Remand (May 13, 2013), ECF No. 100 (public version), ECF No. 101 (confidential version) ("Remand Redetermination"). Accordingly, upon consideration of the Remand Redetermination, the comments of the parties thereon, and all papers and proceedings herein, and upon due deliberation, it is hereby

**ORDERED** that the Remand Redetermination submitted by the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department") on May 13, 2013, be, and hereby is, sustained in part and remanded to Commerce in part in accordance with this Opinion and Order; it is further

**ORDERED** that the Remand Redetermination be, and hereby is, sustained with respect to the Department's redetermination of the surrogate value for the consumption of bearing-quality steel bar by Peer Bearing Company-Changshan ("CPZ"); it is further

**ORDERED** that Commerce shall submit to the court a second Remand Redetermination in which it redetermines, in accordance with the requirements of this Opinion and Order, the country of origin of certain tapered roller bearings that underwent further processing in Thailand consisting of grinding and honing (finishing) of cups and cones, and assembly; it is further

**ORDERED** that Commerce, in its second Remand Redetermination, shall reconsider its use of the factor-of-production data submitted by PBCD, LLC ("PBCD") in calculating the normal value for merchandise that was imported prior to the acquisition and sold by post-acquisition Changshan Peer Bearing Company ("SKF"), shall also consider the possible use of the factor-of-production data submitted by The Timken Company ("Timken") for this purpose, and shall explain the reasons for its choice; it is further

**ORDERED** that Commerce shall submit its second Remand Redetermination within sixty (60) days of the issuance of this Opinion and Order; it is further

**ORDERED** that PBCD, SKF, and Timken shall have thirty (30) days from the Department's filing of the second Remand Redetermination to file any comments thereon; and it is further

**ORDERED** that defendant shall have fifteen (15) days from the last filing of comments on the second Remand Redetermination in which to file any response to such comments.

/s/ Timothy C. Stanceu
_____
Timothy C. Stanceu
Judge

Dated: June 10, 2014
New York, New York