Slip Op. 15- 143

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **PEER BEARING COMPANY – CHANGSHAN**,<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES**,<br><br>Defendant,<br><br>and<br><br>**THE TIMKEN COMPANY**,<br><br>Defendant-intervenor. | **Before: Timothy C. Stanceu, Judge**<br><br>**Consol. Court No. 11-00022** |

## OPINION

[Affirming a remand redetermination issued by the International Trade Administration, U.S. Department of Commerce, in litigation arising from an administrative review of an antidumping duty order on tapered roller bearings and parts thereof from China]

Dated: December 21, 2015

*John M. Gurley* and *Diana Dimitriuc Quaia*, Arent Fox LLP, of Washington, DC, for plaintiff and defendant-intervenor Peer Bearing Company–Changshan.

*L. Misha Preheim*, Senior Trial Counsel, and *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With them on the brief were *Joyce R. Branda*, Acting Assistant Attorney General, and *Jeanne E. Davidson*, Director. Of counsel on the brief was *Justin Ross Becker*, Office of the Chief Counsel for Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

*Herbert C. Shelley* and *Christopher G. Falcone*, Steptoe & Johnson LLP, of Washington, DC, for defendant-intervenors Changshan Peer Bearing Company Ltd. and Peer Bearing Company.

*William A. Fennell*, *Terence P. Stewart*, and *Stephanie M. Bell*, Stewart and Stewart, of Washington, DC, for plaintiff and defendant-intervenor The Timken Company.

Stanceu, Chief Judge: This consolidated action arose from challenges to a final

determination ("Final Results") that the International Trade Administration, U.S. Department of

Commerce ("Commerce" or the "Department") issued to conclude the twenty-second review of

an antidumping duty order on tapered roller bearings ("TRBs") and parts thereof, finished and

unfinished, from the People's Republic of China ("China" or the "PRC"). *Tapered Roller*

*Bearings and Parts Thereof, Finished and Unfinished, From the People's Republic of China:*

*Final Results of the 2008-2009 Antidumping Duty Admin. Review*, 76 Fed. Reg. 3,086 (Int'l

Trade Admin. Jan. 19, 2011) ("*Final Results*").  The twenty-second review pertained to entries of

subject merchandise made during the period of June 1, 2008, through May 31, 2009 ("period of

review" or "POR").  *Final Results*, 76 Fed. Reg. at 3,086.

Before the court is the second redetermination upon remand ("Second Remand

Redetermination") Commerce submitted in response to the court's opinion and order in *Peer*

*Bearing Co.–Changshan v. United States*, 38 CIT __, 986 F. Supp. 2d 1389 (2014) ("*Peer*

*Bearing II*").  *Final Results of Redetermination Pursuant to Court Remand* (Aug. 8, 2014), ECF

No. 126-1 ("*Second Remand Redetermination*").  The court affirms the Second Remand

Redetermination.

## I. BACKGROUND

The background of this case is provided in the court's prior opinions and is supplemented

herein.  *Peer Bearing Co.–Changshan v. United States*, 36 CIT __, __, 884 F. Supp. 2d 1313,

1317-18 (2012) ("*Peer Bearing I*") (first remand order); *Peer Bearing Co.-Changshan v. United*

*States*, 35 CIT __, __, Slip Op. 11-125 at 1-2 (Oct. 13, 2011) (denying a motion to dismiss one of

the claims brought in this consolidated action); *Peer Bearing II*, 38 CIT at __, 986 F. Supp. 2d

at 1392-93 (second remand order).

### A.  The Order and the Scope

Commerce issued the antidumping duty order on "imports of tapered roller bearings from the PRC" (the "Order") in 1987.  *Antidumping Duty Order; Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, From the People's Republic of China*, 52 Fed. Reg. 22,667, 22,667 (Int'l Trade Admin. June 15, 1987) ("*Antidumping Duty Order*").  The scope of the Order, as stated in the Final Results, is "shipments of tapered roller bearings and parts thereof, finished and unfinished, from the PRC; flange, take up cartridge, and hanger units incorporating tapered roller bearings; and tapered roller housings (except pillow blocks) incorporating tapered rollers, with or without spindles, whether or not for automotive use."  *Final Results*, 76 Fed. Reg. at 3,087.

### B.  The Parties to this Consolidated Action

One of the plaintiffs in this action is PBCD, LLC, which in this litigation is representing the interests of two previously-existing companies, Peer Bearing Company–Changshan, a Chinese company that produced and exported subject merchandise during the first few months of the POR, and its affiliated U.S. importer, Peer Bearing Company.

On September 11, 2008, approximately two and a half months into the POR, Peer Bearing Company–Changshan, the sole respondent in the prior (twenty-first) administrative review, and its affiliate Peer Bearing Company were acquired by AB SKF, of Sweden, and subsequently ceased to exist as legal entities.  Both of these previously-existing companies transferred their legal responsibilities relating to the twenty-second administrative review to PBCD, LLC.  In this Opinion, the court refers to the entity litigating claims on behalf of the pre-acquisition companies as "PBCD" and to the pre-acquisition producer Peer Bearing Company–Changshan as "CPZ."

Upon the acquisitions by AB SKF, the production facilities in China were organized as a

new company, Changshan Peer Bearing Co. Ltd., and the affiliated U.S. importer also became a

new company, again named "Peer Bearing Company."  *Second Remand Redetermination* 1 n.1.

During the administrative proceedings, Commerce found that the post-acquisition companies

were not successors-in-interest to their pre-acquisition counterparts and, accordingly, treated the

pre-acquisition and post-acquisition companies as distinct legal entities for purposes of the

twenty-second review.  *Id*.  On the basis of this finding, Commerce split the POR into two

segments based on the September 11, 2008 date of the acquisition, after which date Commerce

considered SKF to have made both the sales and the entries.  *Peer Bearing I*, 36 CIT at __,

884 F. Supp. 2d at 1327.  Both of the new companies, i.e., the two SKF affiliates, are

defendant-intervenors in this action.  In this Opinion, the court refers to the post-acquisition

producer and respondent Changshan Peer Bearing Co. Ltd. as "SKF."

The other plaintiff in this action is domestic TRB producer The Timken Company

("Timken"), which sued separately to contest the Final Results and also was a defendant-

intervenor in the action commenced by PBCD.  *See* Compl., *Timken Co. v. United States*, Court

No. 11-00039 (Mar. 10, 2010), ECF No. 9.  The court consolidated the two cases.  Order

(June 13, 2011), ECF No. 27 (consolidating *Timken Co. v. United States*, (Court No. 11-00039),

into the above-captioned matter).

C.  Procedural History

In *Peer Bearing II*, the court affirmed in part, and remanded in part, the remand

redetermination Commerce issued in response to the court's order in *Peer Bearing I*, directing

Commerce to reconsider two issues.  *Peer Bearing II*, 38 CIT at __, 986 F. Supp. 2d at 1414-15.

The Second Remand Redetermination, submitted August 8, 2014, reduced PBCD's margin from

22.82% to 21.65% and SKF's margin from 22.12% to 19.45%.  *Second Remand*

*Redetermination* 17.

Only Timken and PBCD have commented on the Second Remand Redetermination.

Timken objects to only one aspect of the Second Remand Redetermination.  Timken Co.'s

Comments on Dep't Com.'s Second Redetermination Pursuant to Ct. Remand (Sept. 10, 2014),

ECF No. 130 ("Timken's Comments").  PBCD makes no objection to either of the Department's

determinations on second remand.  Peer Bearing Co.–Changshan's Comments on the Second

Remand Redetermination (Sept. 10, 2014), ECF No. 129 ("PBCD's Comments").

Defendant filed its reply with the court on September 25, 2014.  Def.'s Resp. to

Def.-intervenor's Comments Regarding the Remand Redetermination, ECF No. 131.

## II. DISCUSSION

### A.  Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980,

28 U.S.C. § 1581(c), pursuant to which the court reviews actions commenced under

section 516A of the Tariff Act of 1930 ("Tariff Act"), 19 U.S.C. § 1516a, including an action

contesting the final results of an administrative review that Commerce issues under section 751

of the Tariff Act, 19 U.S.C. § 1675(a).[1]  The court will sustain the Department's redetermination

if it complies with the court's remand order, is supported by substantial evidence on the record,

and is otherwise in accordance with law.  *See* 19 U.S.C. § 1516a(b)(1)(B)(i).

---

[1] All statutory citations to the Tariff Act of 1930 are to the 2006 edition of the United
States Code and all regulatory citations are to the 2011 edition of the Code of Federal
Regulations.

    B.  The Court Sustains the Department's Choice of Factor-of-Production Data to Calculate
        Normal Value for Certain Pre-Acquisition Inventory Sold by SKF During the POR

        In *Peer Bearing II*, the court remanded for explanation the Department's choice of factor-

of-production ("FOP") data to calculate the normal value of TRBs manufactured by the former

producer, CPZ, but sold from SKF's acquired inventory during the POR by the newly-formed

Peer Bearing Company.  *Peer Bearing II*, 38 CIT at __, 986 F. Supp. 2d at 1412-14.  In the First

Remand Redetermination, Commerce had calculated normal value for these TRBs using data

pertaining to CPZ's production of subject merchandise in the brief period between the beginning

of the POR and the acquisition (i.e., the data that PBCD had submitted to the record).[2]  *Peer

Bearing II*, 38 CIT at __, 986 F. Supp. 2d at 1412 (citing *Final Results of Redetermination

Pursuant to Court Remand* 39 (May 13, 2013), ECF No. 100 (public version), ECF No. 101

(confidential version) ("*First Remand Redetermination*")).[3]  In *Peer Bearing II*, the court found

that Commerce had not explained why it chose these data over certain other data, submitted for

the record by Timken, pertaining to CPZ's production of subject merchandise during the *prior

POR*.  *Id.* at __, 986 F. Supp. 2d at 1413.  The court directed Commerce to "reconsider its

selection of the data submitted by PBCD over the data submitted by Timken and provide a

rationale grounded in the requirements of the statute for the data set it chooses."  *Id.*

---

        [2] The record contained three individual sets of FOP data from which Commerce could
discern normal value: (1) production data pertaining to the post-acquisition months of the POR
(submitted by SKF on behalf of the post-acquisition producer); (2) production data pertaining to
the pre-acquisition months of the POR (submitted by PBCD on behalf of pre-acquisition CPZ);
and (3) data pertaining to CPZ's production during the prior (twenty-first) POR (submitted by
petitioner Timken).  *Peer Bearing Co.–Changshan v. United States*, 36 CIT __, __, 884 F. Supp.
2d 1313, 1337-38 (2012) ("*Peer Bearing I*").

        [3] Unless otherwise specified, all citations to Final Results of Redetermination Pursuant to
Court Remand ("Remand Redetermination") filed on May 13, 2013 are to the public version,
ECF No. 100 ("*First Remand Redetermination*").

In the Second Remand Redetermination, Commerce continued to value the TRBs at issue

using the FOP data submitted by PBCD relating to the first three months of the POR.  *Second*

*Remand Redetermination* 13.  Commerce provided an explanation for its decision, reasoning,

*inter alia*, that its decision is compatible with 19 U.S.C. § 1677b(c)(l) "because the record does

not reveal that the merchandise sold by SKF was produced in the prior POR."  *Id.*  Commerce

concluded that without this information "it does not follow that PBCD's FOP data from the prior

POR is a more accurate reflection of PBCD's production of merchandise sold by SKF during the

POR."  *Id.* at 12-13.  Because Commerce provided an explanation as directed by the court and

because no party contests the Department's resolution of this issue, the court sustains this aspect

of the Second Remand Redetermination.

C.  The Court Sustains the Department's Determination that Certain Bearings Exported from
Thailand are Not Within the Scope of the Order

PBCD claims that Commerce unlawfully determined in the Final Results that certain

TRBs exported from Thailand and sold during the POR are subject to the Order.  Upon a second

remand, Commerce now has determined, under protest, that these TRBs are products of Thailand

and therefore outside the scope of the Order.

1.  The Merchandise at Issue

The operations performed in Thailand to produce the finished TRBs that are the subject

of PBCD's claim are described in the court's previous opinions and are summarized briefly

herein.  The TRBs at issue emerged from manufacturing operations conducted by a CPZ affiliate

in Thailand using finished and unfinished TRB parts that CPZ had produced in its Chinese

facilities.  The parts imported from China were (1) unfinished races, i.e., "cups" and "cones,"

that had been forged, turned (i.e., machined), and heat-treated, and (2) finished rollers and cages.

The Thai affiliate performed additional grinding and honing on the unfinished TRB cups and

cones to achieve the dimensions and polished finish that are required for the final product.  The

Thai affiliate then assembled the newly-finished cups and cones together with the finished rollers

and cages to produce the TRBs that were exported from Thailand to the United States.

   2.  The Methodology Commerce Applied in the Final Results to Determine Whether the TRBs
                          Were Subject to the Order

       In the Final Results, Commerce applied what it termed a "substantial transformation" test

to conclude that the TRBs at issue were of Chinese origin and therefore within the scope of the

Order.  For the first part of this test, Commerce considered the record evidence according to six

criteria, drawing a conclusion under each as to whether the record supported or detracted from a

finding that the TRBs were "substantially transformed" in Thailand and therefore outside the

scope of the Order.  *Issues & Decision Mem. for the Final Results of the 2008-2009 Admin.*

*Review*, A-570-601, AR 08-09, at 11-12 (Jan. 11, 2011) (Admin.R.Doc. No. 6041), *available at*

http://enforcement.trade.gov/frn/summary/PRC/2011-1026-1.pdf (last visited Dec. 16, 2015)

("*Decision Mem.*").

       The Department's six criteria were: (1) the class or kind of merchandise within the scope

of the Order, *Decision Mem.* at 12; (2) the nature and sophistication of the upstream processing

(i.e., the processing conducted in China) and the third-country processing (i.e., the processing

conducted in Thailand), *id.* at 13-14; (3) the identification of the processing that imparts the

essential physical or chemical properties of a TRB, *id*. at 14-15; (4) the cost of production and

value added by the third-country processing, *id*. at 15-16; (5) the level of investment in the third

country and the potential for circumvention, *id*. at 16-17; and (6) whether "unfinished and

finished bearings are both intended for the same ultimate end-use," *id.* at 17.  For the second part

of its test, Commerce evaluated its criterion-specific determinations collectively to make an

ultimate finding on whether the TRBs were within the scope of the Order according to the "totality of the circumstances." *Id.*

For the Final Results, Commerce concluded that, based on the totality of the circumstances, the TRBs in question were products of China and therefore subject to the Order. In reaching this conclusion, Commerce acknowledged that the grinding and assembly processes performed in Thailand "are important and necessary processes for the products in question to becoming finished TRBs" and stated that it "does not dispute the fact that a considerable investment was made in the third country." *Id.* at 17.  Commerce reasoned, however, that these findings were outweighed by its findings that "the investment (even though considerable)" and the "process (even though important)" did "not change the class or kind of merchandise," did "not confer the essential characteristics," did "not represent a significant value added to the final product," and did "not change the ultimate end-use to be sufficient to constitute substantial transformation." *Id.*  Commerce found that the TRBs were within the scope of the Order and treated the sales of these products as sales of subject merchandise for purposes of the twenty-second review.

### 3.  The Court's Decision in *Peer Bearing I*

In *Peer Bearing I*, the court did not sustain, in any respect, the Department's determination that the TRBs at issue were subject to the Order.  Instead, the court directed Commerce to reconsider the country of origin determination in the entirety and to ensure that its determination on remand is "based on findings supported by substantial record evidence" and "supported by an adequate explanation of the Department's reasoning."  *Peer Bearing I*, 36 CIT at __, 884 F. Supp. 2d at 1325.  Alluding to the record evidence, the court opined that "[a]ny valid resolution of the origin question posed by this case must consider the assembly process and

the fact that the two major components of TRBs, the cups and cones, underwent not only

assembly in Thailand but *also* grinding and finishing, which Commerce found to be important

and necessary to the functioning of a TRB." *Id*. (emphasis in original).  In addition to its general

objection, the court identified specific flaws in the Department's analysis.

The court concluded, first, that "in applying its totality of the circumstances test,

Commerce gave weight to its first criterion, the inclusion of finished and unfinished parts of

TRBs within the class or kind of merchandise defined by the scope of the Order, but it failed to

supply a reason why this criterion was relevant, on the record of this case, to the country of

origin determination Commerce was making." *Id*. at __, 884 F. Supp. 2d at 1320.  The court

considered it insufficient that Commerce justified its use of this criterion solely on the basis that

it had applied it in country of origin determinations in the past. *Id*. at __, 884 F. Supp. 2d

at 1322.  In discussing the failure to show the relevance of the first criterion, the court observed

that Commerce did not "reach a finding that the 'important and necessary' operations performed

in Thailand posed any circumvention potential" even though "Congress expressly addressed the

exact circumstance posed by this case in the 'prevention of circumvention' provision set forth in

19 U.S.C. § 1677j(b)." *Id*. at __, 884 F. Supp. 2d at 1321.

The court concluded that "with respect to the fourth criterion, the Department made a

finding that the processing performed in Thailand did not represent a significant value added to

the finished product, a finding that is not supported by substantial evidence on the record." *Id*.

at 1320.  Also, referring to certain qualitative record evidence on the multiple machining

processes performed in Thailand on the cups and cones, the court opined that "Commerce

appears to have given little if any probative weight to this qualitative evidence, which detracts

from the Department's country of origin determination." *Id*. at __, 884 F. Supp. 2d at 1323.

Finally, the court found fault with the Department's according significance to "its finding that an unfinished TRB is intended for the same ultimate end use as a finished TRB." *Id*. at __, 884 F. Supp. 2d at 1320.  The court stated that "[n]o individual part exported from China to Thailand plausibly could have been found to be an unfinished bearing, and Commerce made no finding to that effect." *Id*. at __, 884 F. Supp. 2d at 1324.

*Peer Bearing I* did not affirm, in whole or in part, the Department's "substantial transformation" criteria or methodology.  The court specifically found flaws in the Department's application of two of the criteria and the Department's reasoning.  The court considered Commerce to have failed to show the relevance of its first criterion, under which Commerce observed that parts of TRBs, finished and unfinished, are included in the class or kind of subject merchandise.  *Id*. at __, 884 F. Supp. 2d at 1321-22.  The court regarded the Department's use of the sixth criterion, under which Commerce had found that an unfinished TRB is intended for the same ultimate end use as a finished TRB, to be irrelevant to the inquiry Commerce was required to make.  *Id*. at __, 884 F. Supp. 2d at 1324.  Because the factual situation presented was one in which TRB parts (finished and unfinished), not unfinished TRBs, were used in the processing in Thailand, the court reasoned as to "substantial transformation" that the question presented was whether the Chinese-origin parts "were substantially transformed by the third country processing, which included grinding, finishing, and assembly, not whether unfinished bearings were substantially transformed by that processing." *Id*. at __, 884 F. Supp. 2d at 1324.  The court instructed, therefore, that "[a]ny determination Commerce reaches on remand must rely solely on criteria relevant to whether the parts exported to Thailand were substantially transformed . . . ." *Id*. at __, 884 F. Supp. 2d at 1325.

4.  The Department's First Remand Redetermination

In the First Remand Redetermination, Commerce applied its substantial transformation test according to the same six criteria it had applied in the Final Results.  Although changing its analysis in minor ways, Commerce did not alter its ultimate determination that the TRBs in question were within the scope of the Order.  *First Remand Redetermination* 10-36.  Under its "value added" criterion, Commerce replaced the finding the court found unsupported by the record with a new finding that it based on calculated ratios of value added in China and Thailand, concluding from these calculations that the ratios were not representative of a significant value added by the Thai processing.  *Id*. at 23.  Under its other five criteria, Commerce also continued to find that the record "suggested against a finding" that the TRBs had been substantially transformed.  *Id*. at 45.  Commerce again reached the ultimate finding that, based on the totality of the circumstances, the TRBs at issue were subject to the Order.

5.  The Court's Decision in *Peer Bearing II*

In *Peer Bearing II*, the court again remanded the Department's determination, concluding that "[c]onsidered on the whole, the record lacked substantial evidence to support the ultimate finding Commerce reached in the Remand Redetermination."  *Peer Bearing II*, 38 CIT at __, 986 F. Supp. 2d at 1406.  The court cited uncontradicted record evidence that no part exported to Thailand from China was an unfinished or incomplete TRB, that the goods at issue became tapered roller bearings in Thailand, not China, and that the processing in Thailand, which was more extensive that a mere process of assembly or completion, included grinding and honing necessary to produce cups and cones that were ready for assembly.  *Id*. at __, 986 F. Supp. 2d at 1405-06.  The court noted that Commerce itself had concluded "that the machining conducted in Thailand was a 'critical step,'" *id*. at __, 986 F. Supp. 2d at 1405 (citing *First Remand*

*Redetermination* 17) and "that the processes performed in Thailand 'play[ed] [an] important role

in the production of a bearing,'" *id*. (citing *First Remand Redetermination* 18).

Citing *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1097 (Fed. Cir. 2002)

("*Duferco*"), the court in *Peer Bearing II* observed the general rule that Commerce may interpret,

but may not modify, the scope language of an existing antidumping duty order. *Peer Bearing II*,

38 CIT at __, 986 F. Supp. 2d at 1397. As the court stated, "[u]nder this general rule, Commerce

may not place merchandise within the scope of an order if the scope language may not

reasonably be interpreted to include that merchandise." *Id*. (citing *Duferco*, 296 F.3d at 1089).

Furthermore, as it had in *Peer Bearing I*, the court cited 19 U.S.C. § 1677j(b) in its

analysis. In *Peer Bearing II*, the court noted that the statute, although silent on how Commerce

is to interpret scope language when the question is whether a good should be considered to have

originated in the country named in the order, specifically addresses in 19 U.S.C. § 1677j(b), an

"anticircumvention" provision, the situation in which a good imported into the United States is

completed or assembled in a third country. *Id*. at __, 986 F. Supp. 2d at 1398 (citing 19 U.S.C.

§ 1677j(b)(1)(A) and (B)). The court described the anticircumvention authority provided by

19 U.S.C. § 1677j(a)-(d), which empowers Commerce, in certain circumstances, to enlarge the

scope of an order to reach products not covered by the existing scope, as an exception to the

general rule that Commerce may interpret the scope language of an existing order but may not

modify it. *Id*. at __, 986 F. Supp. 2d at 1398 (citing *AMS Assoc. v. United States*,

737 F.3d 1338, 1343 (Fed. Cir. 2013); *Duferco*, 296 F.3d at 1098). The court viewed the

Department's authority to place within the scope of an order merchandise that acquired its

commercial identity in a third country as necessarily narrower than it would be were Commerce

to rely upon the § 1677j(b) authority. Because Commerce had declined to invoke that authority

in the Remand Redetermination, the court concluded that Commerce was required to interpret

the scope language of the Order, which identified imports of tapered roller bearings from the

PRC, "reasonably and not expansively." *Id*. at __, 986 F. Supp. 2d at 1400.  The court reasoned

that "[t]he imported bearings at issue were not, in any literal or ordinary sense, 'imports of

tapered roller bearings from the PRC' as described in the scope language of the Order" because

"[i]t was in Thailand, not China, that the imported merchandise became 'tapered roller

bearings.'" [4]  *Id.* (citation omitted).  In light of the record evidence concerning the production of

the TRBs at issue in this case, *Peer Bearing II* held that "Commerce, when placing the TRBs in

question within the scope of the Order, exceeded its authority to interpret, without expanding, the

scope language contained in that Order." *Id.* at __, 986 F. Supp. 2d at 1406.  The court ordered

Commerce to "submit to the court a second Remand Redetermination in which it redetermines,

in accordance with the requirements of this Opinion and Order, the country of origin of certain

tapered roller bearings that underwent further processing in Thailand . . . ." *Id.* at __, 986 F.

Supp. 2d at 1414.

---

[4] Referring to "imports of tapered roller bearings from the PRC," i.e., the People's
Republic of China, the order in its original form contains the following scope language:

> The products covered by this investigation are tapered roller bearings and parts
> thereof, currently classified in Tariff Schedules of the United States (TSUS) item
> numbers 680.30 and 680.39; flange, take up cartridge, and hanger units
> incorporating tapered roller bearings, currently classified in TSUS item 681.10;
> and tapered roller housings (except pillow blocks) incorporating tapered rollers,
> with or without spindles, whether or not automotive use, currently classified in
> TSUS item number 692.32 or elsewhere in the TSUS.

*Antidumping Duty Order: Tapered Roller Bearings and Parts Thereof, Finished or Unfinished,
From the People's Republic of China*, 52 Fed. Reg. 22,667, 22,667 (Int'l Trade Admin.
June 15, 1987).  The text of the original order mentions "unfinished" tapered roller bearings and
parts only in the title. *Id.*

### 6.  The Department's Second Remand Redetermination

In the Second Remand Redetermination, Commerce determined that the TRBs at issue were not within the scope of the Order and revised both SKF's and PBCD's dumping margins to exclude the relevant sales.  *Second Remand Redetermination* 16-17.

Timken opposes the Department's country-of-origin determination in the Second Remand Redetermination on various grounds.  Timken's Comments 4-15.  PBCD supports the Department's redetermination but offers no specific comments on the issue.  PBCD's Comments 1-2.

### 7.  The Court Sustains the Department's Determination that Certain TRBs Processed and Assembled in Thailand are Outside the Scope of the Antidumping Duty Order

The court sustains the Department's determination that the TRBs at issue are not within the scope of the Order.  The court concludes that the determination implicitly rests upon a reasonable, and not an impermissibly expansive, interpretation of the scope language of the Order and that there is substantial evidence of record to support the Department's ultimate finding that the TRBs are not within that scope, as so interpreted.

*Peer Bearing II* held that Commerce, in the absence of an anticircumvention inquiry conducted under 19 U.S.C. § 1677j(b), must adhere to a reasonable and not an expansive interpretation of the scope language of the Order.  For the reasons discussed in *Peer Bearing II*, the court views the scope language as giving no indication that it was intended to include tapered roller bearings produced in a third country from Chinese-origin parts, finished or unfinished. The record evidence in this case must be considered in light of the scope language, reasonably construed.

In brief summary, the uncontested record evidence—as recounted in the Department's own findings as set forth in previous determinations—is that the processing in Thailand involved

not only necessary machining operations conducted on the cups and cones but also included all assembly operations.  As the court discussed in its previous opinions, the record demonstrates that no part exported from China to Thailand was an unfinished TRB, and Commerce made no finding to the contrary.  In short, there can be no dispute that the merchandise at issue acquired its commercial identity as tapered roller bearings in Thailand, not China.

Although the First Remand Redetermination altered the quantitative findings on the relative value added in China and Thailand, it did not state that Commerce was abandoning the previous factual findings on the nature of the processes performed in Thailand.  Commerce found that the cup and cone machining process in Thailand involved "a series of steps wherein the width, the outside diameter, and bore of the rings (cup and cone) are ground and the inside diameter of the outer ring and the outside diameter of the inner ring are polished, *First Remand Redetermination* 14 (footnote omitted), that "this small change to the shape and surface of the cups and cones (and assembly thereof) is a *critical step* in imparting the very physical properties of each TRB that allow for the product to function as a TRB," *id*. at 17 (emphasis added), and that the processes performed in Thailand "play[ed] [an] important role in the production of a bearing," *id*. at 18.

The court also concludes that the Department's presentation of its reasoning in the Second Remand Redetermination, although sparse and, in some respects, incorrect in its interpretation of the holding in *Peer Bearing II*, nevertheless is sufficient to support the ultimate determination that the TRBs are not within the scope of the Order.  Despite the brevity of the explanation, the court can discern from it a path under which it may sustain the determination. Commerce presents what it labeled as its "Analysis" in a single paragraph, as follows:

> As discussed above, the Court found that the merchandise which "became" subject merchandise in a third country "ordinarily would be considered

to be products of the third country . . . absent an expansion of an order using the
authority of {section 781(b) of the Act.}"  However, we did not conduct a
circumvention analysis pursuant to section 781(b) of the Act.  Thus, in order to
comply with [*Peer Bearing II*], in the absence of an analysis under section 781(b)
of the Act, we cannot find that the TRBs in question are of Chinese origin such
that they are subject to the *Order*.  Further, there is no evidence on the record that
U.S. Customs and Border Protection ("CBP" or "Customs") has conducted a
country of origin analysis and found the TRBs in question to be of Chinese origin.
Accordingly, we revised the dumping margin calculations to exclude sales of
merchandise further processed in Thailand.  However, because we do not agree
with the Court that a circumvention analysis, pursuant to section 781(b) of the
Act, is required before the Department may determine whether merchandise
which is further processed in a third country is subject to an AD or countervailing
duty order, we are conducting this remand respectfully under protest.

*Second Remand Redetermination* 8-9 (footnotes omitted).  The paragraph confirms the

Department's decision not to conduct an analysis using its authority of section 781(b) of the

Tariff Act (19 U.S.C. § 1677j(b)).  Having rejected the idea of conducting such an analysis,

Commerce, in order to comply with the court's remand order in *Peer Bearing II*, was under an

obligation to interpret the scope language reasonably and not expansively and reach an ultimate

determination accordingly.  The court concludes that the Second Remand Redetermination

should be interpreted as an implicit indication that the Department has done so.  The court

reaches this conclusion by presuming Commerce, in formulating the Second Remand

Redetermination, to have acted in good faith, rather than out of a desire to defy the court's

order.[5]  Significantly, Commerce concluded that, in the absence of such an analysis, "we cannot

find that the TRBs in question are of Chinese origin such that they are subject to the *Order*."  *Id*.

---

[5] The Second Remand Redetermination should be read to indicate that Commerce
understood its obligation under the court's remand order in *Peer Bearing II*: "The Court ordered
the Department to submit a 'second Remand Redetermination' in which it redetermines, in
accordance with the requirements of this Opinion and Order, the country of origin of certain
tapered roller bearings . . . ."  *Final Results of Redetermination Pursuant to Court Remand* 8
(Aug. 8, 2014), ECF No. 126-1("*Second Remand Redetermination*").

at 8.  That Commerce prefaced this conclusion with the qualifier that it did so in order to comply

with *Peer Bearing II* does not change the court's conclusion: Commerce endeavored to preserve

its right to appeal by adding that it was doing so respectfully under protest.[6]

The final sentence in the "Analysis" paragraph provides the Department's reason for

making its redetermination under protest, adding that Commerce does "not agree with the Court

that a circumvention analysis, pursuant to section 781(b) of the Act, is required before the

Department may determine whether merchandise which is further processed in a third country is

subject to an AD or countervailing duty order."  *Id*. at 8-9 (citing *Viraj Grp., Ltd. v. United

States*, 343 F.3d 1371 (Fed. Cir. 2003)).  This sentence is overly broad in its implied conclusion.

The court did not hold that Commerce always must conduct a circumvention analysis before it

may determine that merchandise further processed in a third country is subject to an order, and

this case did not require the court to decide this broad question of law.[7]  Instead, the court

---

[6] The Second Remand Redetermination, in quoting in the first sentence of the "Analysis" a statement from *Peer Bearing II*, appears to have taken the court's statement out of context. The quoted statement occurred in a discussion of legislative history, *Peer Bearing Co.-Changshan v. United States*, 38 CIT __, __, 986 F. Supp. 2d 1389, 1402 (2014) ("*Peer Bearing II*"), not in a directive to the Department, and also appears to have ignored the effect of the court's qualifier, "ordinarily."  Moreover, the court did not reach a "finding" to the effect recounted in the Department's opening sentence.  The Second Remand Redetermination also presents a correct interpretation of the court's statement.  *See Second Remand Redetermination* 7.  It also incorrectly interprets the holding of *Peer Bearing II* in rejecting the comments Timken submitted on a draft version of the redetermination, wrongly stating that "underlying the Court's order is an incorrect understanding that the *Order* specifically mentions only 'imports of TRBs from the PRC' and because the TRBs in question are imported from Thailand, the merchandise in question must be considered out-of-scope until lawfully determined to be found within the scope of the *Order*."  *Id*. at 15.  The mere fact that the TRBs at issue were imported from Thailand was not a basis of the court's decision in *Peer Bearing I* or its decision in *Peer Bearing II*.

[7] In its background section, the Second Remand Redetermination also misinterprets *Peer Bearing II* in stating that "the Court found that the plain meaning of the scope of the TRBs *Order* does not support the Department's decision to dismiss the statutory circumvention criteria." (continued…)

concluded, based on binding precedent, that in the absence of such an analysis Commerce must

interpret scope language reasonably and may not expand it.  The court held that on the record of

this individual case, the evidence of record was not sufficient to support the determination that

the TRBs in question are within the scope when the scope language is reasonably, and not

expansively, interpreted.  Had Commerce believed the court to have erred in concluding that the

record did not contain substantial evidence to support an ultimate determination that the TRBs at

issue were within the scope of the Order, its "protest" presumably would have been on that basis

instead.

In summary, the "Analysis" presented in the Second Remand Redetermination, although

suffering from some flaws in the interpretation of the court's holding in *Peer Bearing II*, is

sufficient to allow the court to sustain the Department's ultimate determination under the

standard of review that the court is required to apply.[8]

---

(continued…)

*Second Remand Redetermination* 6.  The court did not hold that Commerce erred in dismissing the statutory circumvention criteria.

[8] The court notes that defendant, in its comments in support of the Second Remand Redetermination, misconstrues the court's opinion in *Peer Bearing II* by arguing that "[a]s Commerce stated in the Second Remand, which it conducted under protest, without the authority to conclude that the merchandise at issue is included in the Order though a substantial transformation analysis, there is insufficient evidence on the record to demonstrate that the TRBs at issue were of Chinese origin."  Def.'s Resp. to Def.-intervenor's Comments Regarding the Remand Redetermination 5 (Sept. 25, 2014), ECF No. 131.  This is incorrect.  In neither *Peer Bearing I* nor *Peer Bearing II* did the court deny Commerce the authority to conduct a "substantial transformation analysis," although the court concluded in *Peer Bearing I* that Commerce had not shown the relevance of certain of its criteria and concluded in *Peer Bearing II* that the Department's method and criteria caused Commerce to ignore critical record evidence.  However, the holding of *Peer Bearing II* was that in the absence of reliance on anticircumvention authority, Commerce is required to interpret the scope language reasonably, and not expansively and that when the scope language is so interpreted, there is insufficient record evidence to support an ultimate determination that the TRBs in question are within the scope of the Order.  It is a matter of speculation whether the particular criteria Commerce chose to apply in the analysis it described as a substantial transformation analysis, considered on the (continued…)

8.  The Court Is Not Persuaded by Defendant-Intervenor's Objections to the Department's
Determination that the TRBs at Issue Are Not Within the Scope of the Order

Timken raises various objections to the Department's determination that the TRBs

resulting from the processing conducted in Thailand are not within the scope of the Order.  For

the reasons discussed below, the court reject's Timken's argument that, based on these

objections, the court must order another remand of the Department's determination.

Timken contends, first, that Commerce was not required to conduct an anticircumvention

inquiry to determine whether the TRBs at issue are within the scope of the Order.  Timken's

Comments 5.  *Peer Bearing II* did not hold that an anticircumvention inquiry under 19 U.S.C.

§ 1677j(b) was a prerequisite to *determining* whether the TRBs at issue are within the scope.

Instead, as discussed above, the court held that this particular record did not provide substantial

evidence to support an ultimate determination that the TRBs at issue *are* within the scope when

the scope language is reasonably interpreted, as it must be when it is considered without the

benefit of an expansion effected by an application of § 1677j(b).  The Department's analysis,

presented in the single paragraph the court addressed previously, indicates that Commerce did

not consider itself able to find that the TRBs at issue are within the scope in the absence of an

anticircumvention analysis.  On the particular record in this case, that conclusion is correct; as

also discussed above, Commerce misinterpreted the court's holding to require such an analysis

*whenever* the Department determines whether merchandise which is further processed in a third

country is subject to an AD or countervailing duty order.  Commerce, however, offered that

misinterpretation as its reason for its issuing the Second Remand Redetermination under protest.

_____

                                                                 (continued…)

whole (at least as applied), were a cause of the Department's interpreting the scope language in
an impermissibly expansive way in the First Remand Redetermination, but it was not necessary
for the court to reach that question.

As the court noted above, it is significant that Commerce did not ground its protest in a claim that there is substantial record evidence for an ultimate determination placing the TRBs at issue within the scope of the Orders when the scope language is reasonably and not expansively interpreted.  Had Commerce chosen to do so, logically Commerce would have included in the Second Remand Redetermination a statement of what that evidence is, why the court erred in concluding otherwise, and why such evidence is sufficient under the "reasonable interpretation" standard required by *Duferco* and its progeny.

Timken next argues that the legislative history shows that the provision to prevent circumvention "was intended to provide Commerce with more tools in its arsenal for enforcing the trade remedy laws and not to restrict its ability to do so." *Id*. at 6.  The court does not disagree with Timken's argument that Congress did not intend to narrow the Department's authority and intended instead to provide another tool in the Department's "arsenal."  But that argument does not address the problem that, in this case, Commerce declined to use the additional tool in its arsenal and therefore was obligated to interpret the scope language reasonably, not expansively.  The court's discussion of the legislative history in *Peer Bearing II* was to the effect that Commerce considered it necessary to provide the additional tool.  *Peer Bearing II*, 38 CIT at __, 986 F. Supp. 2d at 1402.  As the court reasoned, Congress could not have concluded that Commerce needed this tool "without possessing a general understanding that a good emerging from a third country completion or assembly operation such as that described in 19 U.S.C. § 1677j(b)(1)(A) and (B) ordinarily would not be considered to be within the scope of the order in question, at least where, as here, the commercial identity of the finished good was acquired in the third country." *Id*. (footnote omitted).  In this regard, Commerce in the Second Remand Redetermination based its ultimate determination, in part, on its conclusion

"that there is no evidence that U.S. Customs and Border Protection ('CBP' or 'Customs') has

conducted a country of origin analysis and found the TRBs in question to be of Chinese origin."

*Second Remand Redetermination* 8.  Although Commerce does not consider itself bound by

country of origin determinations of other agencies (including Customs), *see Peer Bearing II*,

38 CIT at __, 986 F. Supp. 2d at 1402 n.9, nothing precluded Commerce from considering how a

country of origin issue might be approached according to general country of origin principles

developed under the customs laws.  On this general issue, Timken notes the Department's

mention in the Second Remand Redetermination of the lack of an analysis by Customs placing

the TRBs in question within the scope of the Order in arguing that, as recognized in decisions of

this Court, "the Department is not bound by Customs decisions."  Timken's Comments 12.  In

the Second Remand Redetermination, Commerce gave no indication that it considered itself

*bound* by a Customs ruling or lack thereof.

     Timken also argues that "[t]he anticircumvention provision is not intended to address all

situations in which merchandise is further manufactured in a third country."  *Id*. at 7.  Citing

*AMS Assoc. Inc. v. United States*, 737 F.3d 1338, 1343 (Fed. Cir. 2013) and certain language in

the legislative history of the anticircumvention provision, Timken submits that "the

anticircumvention provision was tailored to address situations where, when the goods subject to

the order either leave the subject country or enter the United States, they could reasonably be

found not to match the product description of the scope."  *Id*. at 8 (footnote omitted).  Neither

situation, according to Timken, is present in this case because "[a]s the subject order covers

TRBs, finished and unfinished, and TRB parts, finished an [*sic*] unfinished, both the goods that

leave China and the goods that enter the United States fit within the product description of the

scope."  *Id*. at 8 n.6 (citations omitted).

This argument ignores the point that the plain language Congress chose to use in

19 U.S.C. § 1677j(b) describes the situation posed by this case.[9]  Timken's argument does not

convince the court that the legislative history establishes a narrower scope to the

anticircumvention provision of § 1677j(b) that is inapplicable to this situation.  Moreover, this

argument does not confront the limitations inherent in the scope language, which identifies

"shipments of tapered roller bearings and parts thereof, finished and unfinished, from the PRC."

*Final Results*, 76 Fed. Reg. at 3,087.  As revealed in this language, the class or kind of

merchandise identified as subject merchandise by the scope language falls into four separate

categories: finished TRBs from the PRC, unfinished TRBs from the PRC, finished parts of TRBs

from the PRC, and unfinished parts of TRBs from the PRC.  There is no mention in the scope

language of a fifth category applying to TRBs that are produced in a third country from

unfinished and finished parts from the PRC.  The TRBs at issue did not *become* TRBs in China:

what was produced and exported from China to Thailand consisted solely of TRB parts, finished

and unfinished, and no such part reasonably could be described as an unfinished TRB.  Finally,

the holding of *AMS Associates, Inc.*, which pertains to suspension of liquidation, does not

address the issue this case presents.

---

[9] Timken attempts to distinguish the facts of this case from situations in which, in Timken's view, Congress intended for 19 U.S.C. § 1677j to apply.  Timken argues both that "Congress *chose not to specify* the exact circumstances that would be covered by [19 U.S.C. § 1677j]," Timken Co.'s Comments on Dep't Com.'s Second Redetermination Pursuant to Ct. Remand 6 (Sept. 10, 2014), ECF No. 130 (emphasis added), and also argues that the "[l]egislative history of the anticircumvention provision also indicates that it was intended to address *two situations in particular*" and "neither of these situations is present here."  *Id.* at 8 & n.6 (emphasis added).

Timken further relies on *AMS Associates, Inc.* for the point that "country of origin

determinations may be undertaken in scope inquiries"[10] and also relies on *Smith Corona Corp. v.

United States*, 17 CIT 47, 49-50, 811 F. Supp. 692, 695 (1993) to make the point that "further

manufacturing in a third country does not automatically change the country of origin of a good."

Timken's Comments 9-10.  Similarly, Timken cites the Statement of Administrative Action for

the Uruguay Round Agreements Act ("SAA") for the principle that "not all goods manufactured

in a third country fall within the purview of circumvention," Timken's Comments 10 (quoting

*Statement of Administrative Action Accompanying the Uruguay Round Agreements Act*, H.R.

Rep. No. 103-316, at 174 (1994) ("[o]utside of a situation involving circumvention of an

antidumping duty order, a substantial transformation of a good in an intermediate country would

render the resulting merchandise a product of the intermediate country rather than the original

country of production.")).  These arguments do not address the narrow question presented here,

which is whether the court must reject, and remand again, the Department's determination upon

remand that the TRBs at issue are outside the scope of the Order.  The language Timken quotes

from the SAA does not support a contention that the court must do so.[11]  The question posed by

---

[10] Timken cites language from *AMS Associates Inc. v. United States*, 737 F.3d 1338, 1343
(Fed. Cir. 2013), explaining that "Commerce may conduct formal circumvention inquiries
pursuant to 19 C.F.R. §§ 351.225(g)-(j) and may conduct formal scope inquires pursuant to
19 C.F.R. § 351.225(k), which may include country of origin determinations."  Timken's
Comments 9-10.  With respect to the latter provision, no party in this case argued that Commerce
was required to address the factors identified in § 351.225(k)(1) or (2) in making the country of
origin determination it made in the Final Results, in which Commerce instead applied the
aforementioned criteria.  In this litigation, the court neither affirmed the application of those
criteria nor prohibited Commerce, on remand, from considering the factors identified in
§ 351.225(k).

[11] Additionally, the language Timken quotes from the SAA is part of a discussion of
section 773(a)(3) of the Act, which pertains to the Department's use of intermediate sales as a
basis for normal value, which is not at issue here.

this case is whether the record contains substantial evidence to support an ultimate determination

that the tapered roller bearings resulting from the processing in Thailand constituted "imports"

[or, as stated in the Final Results, "shipments"] "of tapered roller bearings from the PRC" when

that scope term is construed reasonably, and not expansively.  The SAA uses the term

"substantial transformation."  Expressed in a way that uses that term, the question in this case is

not whether any TRBs are substantially transformed but whether unfinished cups and cones and

finished cages and rollers undergo a substantial transformation in *becoming* TRBs as a result of

the manufacturing operations performed in Thailand.

Timken argues, further, that "[t]he sole fact that a good has been further manufactured in

a third country does not mandate that the Department undertake an anticircumvention inquiry to

determine that the good remains within the scope of an order."  Timken's Comments 11

(footnote omitted).  The court did not reach a holding to the contrary.  Moreover, the ultimate

question presented here does not involve "a good that has been further manufactured in a third

country."  In this case, only the cups and cones, and not TRBs, were goods that were further

manufactured in a third country.  And although Commerce reasoned in the First Remand

Redetermination that the unfinished and finished parts that left China for Thailand would have

been within the scope of the Order had they been exported to the United States, they were not so

exported and, in the form in which they entered Thailand, were not finished or unfinished TRBs.

Timken next cites three decisions of this Court in arguing that this Court in the past has

affirmed the use of the Department's country of origin criteria.  These decisions are neither

precedential nor supportive of the argument Timken puts forth.

Timken relies on *E. I. DuPont de Nemours & Co. v. United States*, 22 CIT 370, 373,

8 F. Supp. 2d 854, 858 (1998) ("*DuPont*"), for the proposition that "the Court must defer to the

Department's reasonable interpretation of the statute when the statue is silent or ambiguous, and, on this basis, the Court has determined that the Department's substantial transformation test is a permissible application of the statute." Timken's Comments 11-12. This reliance is misplaced. In *DuPont*, this Court remanded for reconsideration and further explanation a final scope ruling in which Commerce concluded that the scope of an antidumping duty order on polyvinyl alcohol from Taiwan included polyvinyl alcohol produced in Taiwan from U.S.-origin vinyl acetate monomer. *DuPont*, 22 CIT at 376, 8 F. Supp. 2d at 860. Although remanding, the Court accorded deference to the "'substantial transformation' rule" Commerce applied in the case, concluding that this rule is "a reasonable application of 19 U.S.C. 1673(1) [referring to "class or kind of foreign merchandise"] because it comports with the plain meaning of the statute." *Id.* at 374, 8 F. Supp. 2d at 858. As stated in the opinion, the country of origin rule Commerce applied was as follows: "[s]ubstantial transformation generally refers to a degree of processing or manufacturing resulting in a new and different article," citing as examples Commerce rulings recognizing as substantial transformations the galvanizing of sheet steel and the conversion of a base vehicle into a limousine. *Id.* at 372, 8 F. Supp. 2d at 857. This statement of the substantial transformation rule accords with the substantial transformation rule established under the customs laws. *See United States v. Gibson-Thompsen Co., Inc.*, 27 C.C.P.A. 267 (1940). It is not the substantial transformation criteria upon which Commerce concluded, in the Final Results and the First Remand Redetermination, that no substantial transformation occurred in Thailand. Among the cases this Court cited in *DuPont* was *Ferrostaal Metals Corp. v. United States*, 11 CIT 470, 664 F. Supp. 535 (1987), which held for purposes of a voluntary restraint agreement that sheet steel is substantially transformed by galvanizing and annealing according to customs law principles of substantial transformation. Because TRBs are a new and different article when

compared to unfinished cups and cones and finished rollers and cages, the standard Commerce

applied in *DuPont* would lead to the conclusion that the country of origin of the TRBs at issue in

this case is Thailand and thereby produce the opposite result from the one Timken is advocating.

Timken argues, further, that this Court "has also affirmed country of origin

determinations based on a substantial transformation analysis," citing *Appleton Papers Inc. v.*

*United States* , 37 CIT __, __, 929 F. Supp. 2d 1329, 1335-36 (2013) ("*Appleton Papers*") and

*Advanced Tech. & Materials Co. v. United States* , 35 CIT __, __, Slip Op. 11-122 at 8

(Oct. 12, 2011).  Timken's Comments 12.  As Timken acknowledges, *Appleton Papers* cites

*DuPont* in stating that "[t]his Court has upheld Commerce's use of the substantial transformation

analysis as a means of determining the country of origin of merchandise produced in multiple

countries."  *Appleton Papers*, 37 CIT at __, 929 F. Supp. 2d at 1336.  *Appleton Papers* upheld a

Commerce decision interpreting the scope of antidumping and countervailing duty orders on

lightweight thermal paper from China, in which Commerce concluded that lightweight thermal

paper in unfinished "jumbo roll" form that had been produced outside of China was not within

the scope of those orders because it had not been substantially transformed in China when it

underwent a "conversion" process consisting of slitting and repackaging.  *Id.* at __, 929 F. Supp.

2d at 1335-36.  Citing various decisions of the Court of Appeals that relied upon the principle

established in *Duferco*, this Court reasoned that Commerce could neither interpret an order so as

to change the scope nor interpret an order contrary to its terms.  *Id.* at __, 929 F. Supp. 2d

at 1334-35 (citing *King Supply Co. v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012), in

turn quoting *Walgreen Co. v. United States*, 620 F.3d 1350, 1354 (Fed. Cir. 2010)).  Moreover,

this Court concluded in *Appleton Papers* that Commerce had correctly interpreted the scope in

applying the substantial transformation test previously applied in *DuPont*, *id*.; this test did not

apply the criteria Commerce applied in the Final Results and the First Remand Redetermination.

*Appleton Papers* does not support the position *Timken* has taken in this litigation.

Like *Appleton Papers*, *Advanced Technologies* relies on *DuPont* for the principle that the

Department's "'substantial transformation' rule provides a yardstick for determining whether the

processes performed on merchandise in a country are of such significance as to require that the

resulting merchandise be considered the product of the country in which the substantial

transformation occurred." *Advanced Tech.*, 35 CIT __, __, Slip Op. 11-122 at 8 (quoting

*DuPont*, 22 CIT at 373-74, 8 F. Supp. 2d at 858). Nevertheless, this Court identified three

factors as part of the substantial test that are not part of the test as articulated in *DuPont*, namely,

"(1) whether the processed downstream product falls into a different class or kind of

merchandise from the upstream product; (2) whether the essential component of the merchandise

is substantially transformed in the exporting country; and (3) the extent of processing in the

exporting country." *Id*. Therefore, the case involved the application of two criteria that

Commerce applied in this case. This aspect of *Advanced Technology* supports Timken's

argument, but the decision this Court reached on the merits does not. This Court affirmed, over

the objections of the domestic interested party, Diamond Sawblades Manufacturers Coalition, the

Department's conclusion that "the country of origin for diamond sawblades was the country in

which the diamond segments were joined to the core," *id*. at __, Slip Op. 11-122 at 7, even

though the subject merchandise was defined to include both the finished product and components

thereof.

Timken's final objection is that Commerce impermissibly grounded its conclusion that

the TRBs in question are not within the scope on only two factors: its "determination to not

undertake an anticircumvention inquiry and the lack of a Customs ruling finding that the TRBs at

issue are of Chinese origin."  Timken's Comments 14.  According to Timken, "[a]s these are the

only bases for Commerce's determination, the Department's conclusion is not supported by

substantial evidence."  *Id*.  Timken asserts that this determination fails to comply with the court's

order, which required Commerce to "redetermine the country of origin," and that "[w]hile

Commerce stated that it could not find the TRBs to be of Chinese origin, it did not determine that

the TRBs are of Thai (or any other) origin."  *Id*.  This argument does not convince the court that

a third remand is necessary in this case.  The court has acknowledged that the Department's

rationale for its decision in the Second Remand Redetermination is only sparsely presented and

not correct in all respects.  However, the Second Remand Redetermination reaches an ultimate

determination—that the TRBs at issue are not within the scope of the Order—that is supported

by substantial evidence, for the reasons the court has discussed in this Opinion.  In its comments,

Timken does not attempt to show that the record evidence, considered on the whole, did not

allow Commerce to reach this determination.  That, upon a second remand, Commerce

considered the country of origin of the TRBs at issue to be Thailand is implicit from the posture

of this case.

### III.  CONCLUSION AND ORDER

For the reasons discussed in the foregoing, the court affirms the Final Results of

Redetermination Pursuant to Court Remand ("Second Remand Redetermination")  and will enter

judgment accordingly.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Chief Judge

Dated:  December 21, 2015
        New York, New York